Staples, J.
The appellant filed her bill in the corporation court for the city of Lynchburg, asking for a divorce a mensa et thoro from the appellee. Cruelty and desertion are alleged as the grounds of the application. Both are positively denied by the appellee in his answer. Subsequently the appellant filed an amended bill, in which she not only reiterates the charges of cruelty and* desertion, but avers lewdness of conduct and adultery on' the part of the appellee.. The latter filed his answer, denying the charges in the most positive and explicit terms. In the progress of the suit numerous depositions were taken, in many of which the examination was protracted to great length, one of the appellant’s witnesses being asked on cross-examination one hundred and one questions, and one of the appellee’s witnesses being *310 asked one hundred and'twenty-nine questions. The record, numbering some four hundred pages, exhibits a controversy through all its stages conducted with the greatest bitterness and asperity. Even the private letters of the parties, written in the confidence of friendship and affection, have been subjected to the ordeal of public scrutiny and criticism. The counsel on both sides have argued the case with an ability and fervor which plainly show how deeply their feelings are enlisted in “the cause of their clients. And not merely the parties, their counsel and friends, but it is apparent a large part of the community where the case originated are deeply interested in the controversy. This is not at’all surprising, for both parties are persons of high social position. The appellant is represented as a lady of many personal attractions, and of the highest culture and refinement; and the appellee as a man of excellent character, of amiable temper, and of unimpeached integrity. This court—no court—could view without the deepest concern such a controversy, not only on account of its disastrous consequences to the parties, but from its deleterious effects upon the community. The difficulties of the case are greatly increased by the fact that, in addition to the matter of the divorce, we are called upon to decide the question of custody and control of the helpless infant, the only fruit of this unhappy marriage. Our consolation is that, in performing this duty, 'we have neither partiality nor prejudice, that our utterance is but the voice of the law as the wisdom of sages has established it. We are powerless to prevent or to settle controversies; we can only decide them as they are brought before us.
The first question, if not in order of time, certainly in importance, is the one involving the charge of adultery. The bill avers that the appellee has committed adultery on various occasions. Only one instance, however, is specified, and that is that the appellee was guilty *311 ■of adultery in the city of Philadelphia, at a house of ill-fame, in a certain street named, on Sunday, the night ■of the 10th September, 1876, the names of the females being unknown. In support of this charge a single witness is introduced, who states that during the centennial exposition he saw the appellee in a house of ill-fame, in the city of Philadelphia. The witness states that as he entered the door of one of the parlors, he saw the appellee, in company with a friend, arise from a sofa, and that he was bidding one of the women of the house goodbye. He supposes the appellee had had some words with her; he, the appellee, turned around and left the parlor door; he does not know whether the appellee went to the street or -to some other part of the house. This is the whole case, allegation and proof, with respect to the commission of adultery.
The appellee, in his answer, says he admits that on the evening of the 10th September, 1876, he, in company with a friend, J. H. Ballard, did visit a house in Philadelphia, which, after he entered it, he found to be & house of ill-fame. He states that he and Ballard, being in that city without comfortable quarters, on Sunday evening appellee suggested they should look out for another room. Ballard said he had seen a placard on a house just around the nearest corner with rooms to let ” on it. . They went to the house, ringing the hell at the front door, which was opened by a white woman, supposed to be a servant, who, upon being told what was wanted, conducted appellee and Ballard to the parlor. On stating the object of their visit, one of the women said they could accommodate them with rooms, but she thought it probable they had made a mistake, and that they, the inmates, were rather too fast for them. They at once got up and left the premises. This was the only time appellee was ever in •said house. He was there only for a few minutes. Hu *312 ring the time, he uttered no word and committed no act in violation of the strictest propriety.
This is the appellee’s explanation. To sustain it he adduces the testimony of Ballard. I do not deem it necessary to state any portion of that testimony here. It is sufficient to say it fully corroborates the account given by the appellee. The learned counsel for the appellant quotes an observation of Lord Stcnoell, that “ the act of going to a house of ill-fame is characterized by our old saying that ‘ people do not go there to say their ;pater nosters,’ that it is impossible they can have gone there for any but improper purposes, and that it is universally held as proof of adultery.” To this it is answered by an eminent writer, “ Obviously, however, such a visit is open to explanation, as it may be one of philanthropy, or of accident, or even of lawful business, which should not be construed into an act of guilt.” 2 Bishop on Marriage and Divorce, § 626.
And this would seem to be the dictate of common sense and common justice. For nothing could be more manifestly unjust than to say that a man who should go to a house of ill-fame, necessarily goes there for an improper purpose. Such an act, wholly unexplained, might be considered evidence of guilt, but it is clearly not one which precludes explanation.
In this ease the appellee, in direct response to the charge in the bill, has made a statement of the circumstances of his visit to the house in Philadelphia.- He is called upon to answer, and he has given his answer, and I think he is entitled to the benefit of it, as in other cases in chancery. The statute provides that the suit for a divorce shall be instituted and conducted as other suits in equity. The single exception is that the bill shall not be taken for confessed, and that whether the defendant answer or not, the cause shall be heard independently of the admissions of either party, in the ’ *313 pleadings or otherwise. As was said in Bailey v. Bailey, 21 Graft. 43, 90, the purpose of these provisions was to prevent a decree being obtained by collusion of the parties, and not to change the rules of evidence, or to provide a different mode of proving the facts from that pursued in other cases.
The defendant, in every case, may respond to the charges in the bill in his answer; and he is entitled to the benefit of it. It is the law of the forum, and all who apply to it for relief must submit to have their causes tried according to the established mode of procedure. Thornton v. Gordon, 2 Rob. R. 719-726. Cases of divorce, so far from justifying a relaxation of this rule, would seem to call for its special observance. Bor while the plaintiff, for reasons of public policy, cannot obtain a decree upon the admission of the defendant, clearly the latter, against his or her express denial, ought not to be convicted of a violation of the mariage vow; nor should so important a relation be dissolved upon less evidence than is required to annul an ordinary contract for the sale of property. If it be conceded, in the present case, that the circumstances of suspicion against the appellee are of a grave character, this court cannot refuse him the benefit of his answer, nor would it be inclined to do so, especially when such refusal would be to fix upon him the imputation of perjury, in addition to the crime of adultery. •
Rut, discarding this view entirely,, we have the testimony of Ballard. Ho effort has been made to impeach his reputation as a man of veracity. Ho witness says he is unworthy of belief. He was subjected to a very rigorous cross-examination, but I think it wholly failed to throw any discredit upon his testimony. It is true that the appellant’s witness, Dawson, says he does not think Ballard is the friend he saw with the appellee on the *314 occasion of the visit to the house in Philadelphia. He says, however, he is by no means certain—he could not see the person plainly that night—he was not acquainted with him, and did not take particular notice of him. It must be borne in mind it was not the appellant, but the appellee who brought out this testimony. It was the appellee who confronted appellant’s witness with Ballard, and demanded of the former to say whether he was not the same person seen in Philadelphia, which I think would scarcely have been done if the account of Ballard’s presence had been a fabrication. Ballard says that upon his return from the centennial, he mentioned to several persons in Lynchburg—and he gives the names of some of them—the fact of this visit to the house of ill-fame, as a good joke upon the appellee and himself. None of the persons named are called to contradict him; and it is to be presumed he did mention the subject of the visit. If he did, it would go far to show that the parties regarded the whole affair as a harmless joke,-of which they were the victims,.and that they made'no effort whatever to conceal the occurrence. Upon the whole I am satisfied that the account of this affair given by Ballard and the appellee, is true in every material particular, and that the charge of adultery is not sustained by the proof.
The bill contains another charge, not of actual adultery, but of improper solicitation on the part of the appellee, introduced, no doubt, for the purpose of showing the adulterous intent. The charge is that the appellee, in the month of September, 1876, solicited Eliza Patterson, a young mulatto woman, then a servant of his wife, to have carnal intercourse with him. It is not pretended that adultery was actually committed, but simply that there were repeated solicitations to that effect. The only witness relied on to support this charge is Eliza Patterson herself—without a single corroborating circumstance to *315 support her. The force of her testimony is entirely destroyed by the evidence of three witnesses. It is true they are the mother and brothers of the appellee. JBut the record shows they are persons of high social position, and it is impossible to believe they are capable of wilful and corrupt perjury with respect to the matters to which they testify. If these witnesses speak the truth, it is manifest that the story as told by Eliza Patterson is an entire fabrication from beginning to end. In this connection it is worthy of observation that this witness, previous to the present deposition, had given an affidavit in which she detailed, with great particularity, numerous acts of an objectionable character on the part of the appellee; but she made no allusion whatever to the alleged solicitations stated in her deposition. When asked the reason of her silence in this respect, she could only say she did not think of them at the time. I am of opinion that this charge is not sustained.
Another charge bearing upon the question of adultery, not made, however, in the bill, but brought out for the first time in the evidence, is that the appellee was an attendant upon a ball given at a house of ill-fame, in the city of Lynchburg, in the year 1876, during the session of the United States court in that city. Two witnesses are introduced who say they saw him on that occasion. Eow it is a little remarkable that, although the person of the appellee was well known in the community, out of some thirty or forty persons who must have been present at this ball only two can be found who testify to his being present on the occasion referred to. One of these is proved to have been much intoxicated at the time; and the other had but a slight acquaintance with the appellee. On the other hand, the appellee has taken the depositions of some ten or twelve witnesses, including young men to whom he was well known, and police officers whose occupation makes them familiar *316 with the haunts of vice, and whose duty requires them to be present on such occasions, and all of them concur saying the appellee was not present at the ball described by the appellant’s two witnesses. At all events, ^ no£ See or hear of his being there—that, if a married man had attended such a place, it would have been the subject of conversation at the time, and on the streets the next day. These witnesses say they never at any time saw the appellee in a house of ill-fame, and they never even heard of such a thing until this charge was made. This evidence is, of course, purely of a negative character, but it is certainly very persuasive. One can but be struck with.the fact that the appellee has himself throughout opened the door to the severest enquiry. His witnesses, men most likely to be informed, were not confined to the charge of attendance upon this particular hall, but were asked to speak with reference to his habits generally, in respect to such places—to tell not only what they had seen, but what they had heard, as to his attendance upon other balls, and other houses of ill-fame; and upon these points the testimony, so far as negative testimony can go, is a very satisfactory vindication of the appellee.
"With respect to the only remaining charge, bearing upon the question of adultery, also brought out in the evidence, that of making the signal upon the Danville bridge, I deem it unnecessary to discuss it. It is fully and completely disproved by the evidence.
Before passing from this branch of the case, it is proper to allude to the earnest efforts made to fix upon the appellee the commission of adultery, or some other lewdness of «conduct inconsistent with his marital duties. The evidence strongly tends to show that, to this end, extraordinary efforts w7ere made, rewards were offered, detectives were put on the track, and all the sources and avenues of information fully explored. The only result *317 has been the several charges already considered. I do not allude to this for the purpose of attaching censure to any one. I think it is proper to say that a man who can pass through such an ordeal unscathed has shown a correctness and propriety of deportment deserving, at least, some notice and consideration.
The next subject of enquiry is the charge of cruelty. As this is, perhaps, mainly relied on as a ground of divorce, it becomes necessary to examine the allegations of the bill, and the evidence bearing upon this point, with more minuteness than is required in other branches, of the case.
The appellant, in her original bill,.states that “among the acts of cruelty which chai’acterized the earlier portion of her married life, she was required by her husband, before they went to Danville, to conceal her want of sympathy with his political course; that her obedience to his injunctions in this respect eiit her off from all other sympathy, and that she found herself alone with him, a social pariah.” This certainly is a most extraordinary statement, in view of the fact, disclosed by this record, that the parties lived together for several years in the greatest harmony and affection, and that, both in Danville and in Lynchburg, wherever they resided, or wherever they visited,- they were received into the best society and were upon terms of friendship, if not of intimacy, with the best people in those cities. It will he seen further on how groundless is this charge, as well as many others contained in this record. The parties were married in the fall of 1873, and shortly thereafter removed to the town of Danville, Va., where they resided until the summer of 1875. They then went to Kentucky upon a visit, remaining there some four or five months. Kumerous witnesses have been examined as to their conduct during this period—witnesses living upon terms of the closest intimacy with them—and not one of them testifies to any *318 unkindness, in acts or words,,on the part of the appellee to the appellant, on any occasion. It is very clear that their difficulties did not commence until after their .removal to Lynchburg, in the winter or spring of 1876, and after they had become inmates of the family of "Woodville Latham, Jr., the brother of the appellee.
Let us, then, enquire into the conduct of the appellee during the period of the residence at the house of Wood-ville Latham, Jr., and subsequent to it.
Some of the witnesses state that the appellee was very indefferent to the appellant, and studiously neglected her on many occasions; but when pressed upon the cross-examination, they are only able to say they have seen him pass her on the streets without speaking to, and apparently without noticing her. Others testify that it was the habit of the appellee to take the child away with him in the morning, and not to return with it until the afternoon, thus depriving the mother of its company and its nurture. And yet one of these witnesses, a lady of intelligence, living near the parties, upon being asked if she noticed where the child was kept before and after their difficulties were made public, states that she usually saw the child in the parlor, playing about the window, and that it was there very often. This was after their differences were made public. Before this, she never noticed it at any particular place, saw it playing in the porch and with its mother, but after this usually saw it at the parlor wdndow.
Again it is said that the relatives and friends of the appellant were not treated with civility and respect by the family of the appellee. Miss Graves, a sister of the appellant, visited the latter at the house of Woodville Latham, Sr., in November, 1876, and remained there some time. Upon leaving there she expressed herself as highly pleased with the manner in which she had been entertained, and grateful for the kindness she had re *319 ceived. In her deposition, given in this case, she admits that, upon arriving at the house of Mr. Woodville Lafham, Sr., she was received very cordially, and and so treated for a few days. After that, they were polite and civil, but not at all cordial she thought. It has been asserted and reiterated, again and again, that the family of Woodville Latham, Sr., were hostile to the appellant, and that they had banded together to destroy her peace and happiness. I have examined this record with the greatest care, and I have not been able to find a scintilla of evidence tending to show that either the father, mother or sisters, on any occasion, were guilty of incivility or unkind acts or words to the appellant. It may be there were such, and that they have been carefully concealed from the public eye. The record does not exhibit anything of the kind; and this court- cannot act upon mere conjectures and presumptions having no support from the evidence.
Again it is said, and this charge is reiterated with great earnestness, that the appellee actually sold the bed and bedding of the appellant, and left her without the common comforts and necessaries of life. The evidence shows that the appellee owned the furniture, including the bed and bedding in the room occupied by the appellee and appellant in the house of Woodville Latham,
Sr., and that this furniture, with the exception of some articles belonging to the appellant, was sold by the appellee to his mother. It is manifest, however, that this sale was made after the appellant had left there, after all efforts at an adjustment had failed, and the appellant had determined to live separate and apart from her husband.
I have thus attempted to notice briefly all the charges of cruelty brought against the appellee. Most of them have reference to a period when the difficulties between the parties had become open and notoiious, and when both had become embittered by the controversy in which *320 they were engaged. It is no part of my duty to vindicate the appellee any further than is proper to a right understanding of the merits of the case. It may be conceded that his conduct has been far from blameless, but if each and every specification of cruelty had been established it would not constitute such legal cruelty as would justify a decree for a divorce. The appellant in her bill charges coldness on the part of her husband, non-appreciation of her efforts in the discharge of her wifely duties, his treatment often degenerating into sneers and taunts and bitter complaints. ' But she does not charge any acts of cruelty or violence, or even threats and menaces. Her brother states that, during the whole of his visit in the fall of 1876, he never observed anything like a disturbance, a dispute, or quarrel between them. "With respect to the bruises upon the wrists of the appellant, they are fully explained. The appellant coming down stairs, and finding the front door locked, attempted, in a paroxysm of excitement, to jump through the parlor window into the street. She was caught by the appellee and held by the wrists. The door was immediately unlocked, and she was implored to go out by that way; but she refused to do so, persisting in her purpose of going through the window. There is no doubt that the sole purpose of the appellee was to prevent a scene on the street mortifying to all concerned. "With this exception, if exception it can be considered, there is not a particle of testimony showing any act of cruelty or violence on the part of the appellee, or any menaces, or conduct to justify an apprehension of bodily harm, or that the appellant was, at any time, molested or in any manner restrained in her perfect freedom of action.
In applying the law to the evidence just considered, I ■shall not attempt any definition of cruelty, as used in our statutes, beyond what is laid down in the books. According to the authorities, the cruelty that authorizes *321 a divorce is anything that tends to bodily harm and thus renders cohabitation unsafe; or, as expressed in the older decisions, that involves danger of life, limb or health. I agree there nniy he eases in which the husband, without violence, actual or threatened, may render the marriage state impossible to be endured. There may be angry words, coarse and abusive language, humiliating insults, and annoyances in all the forms that malice can suggest, which may as effectualty endanger life or health as personal violence, and which, therefore, would afford grounds for relief by the court. I5ut it is obvious that what merely wounds the feelings without being accompanied by bodily injury or actual menace—■ mere austerity of temper, petulance of ,manner, rudeness of language, want of civil attention and accommodation, or even occasional sallies of passion that do not threaten harm, although they be high offences against morality in the married state, does not amount to legal cruelty. It is so laid down by the leading authorities in England, and in this country, and is so declared by this court in Carr v. Carr, 22 Gratt. 168, 175; 1 Minor Institutes and cases cited, 256, 257. In the language of a very great judge: “Under such misconduct of either of the parties, for it may exist on one side as well as the other, the suffering party must bear, in some degree, the consequences of an injudicious connexion; must subdue, by decent resistance or prudent conciliation; and if this cannot be done, both must suffer in silence. And, if it is complained that by this inactivity of the courts much injustice may be suffered, and much misery produced, the answer is that courts of justice do not pretend to furnish cores for all the miseries of human life. They punish or redress gross violations of duty—they cannot make men, virtuous; and as the happiness of the world depends upon its virtue, there may be much unhappiness *322 ■which human laws cannot undertake to remove. * * Petty vexations applied to a diseased and exquisite sensibility of mind, may certainly, in time, wear out the animal machine; hut still they are not cases for legal relief. People must relieve themselves as well as they can by prudent resistance, by calling in the means of religion, and the consolations of friends; but the aid of the courts is not to he resorted to in such cases with any effect.” I have thus quoted, at length, some of the observations of Sir William. Scott, in Evans v. Evans, 1 Hagg. Cons. R. 35, because they are very appropriate to the present case, and because they express the rules which govern the courts upon questions of this kind with a force, a wisdom and an elegance which command almost universal approbation. Tested by these rules, the application for a divorce on the ground of cruelty, cannot he sustained.
The next subject of enquiry is the charge of desertion. And here it is important to consider what constitutes desertion, as described in the books. Fortunately we are saved any discussion of that question, or reference to authorities elsewhere, by an adjudication of our own court. The case of Baily v. Baily, 21 Gratt. 43, was decided by a unanimous court. It was followed and approved in Carr v. Carr, 22 Gratt. 168, and is sustained by the general current of authorities. In Baily v. Baily, the doctrine is thus laid down by Judge Christian, speak-for the whole court: “Desertion is a breach of matrimonial duty, and is composed first, of the actual breaking off of the matrimonial cohabitation, and secondly, an intent to desert, in the mind of the offender. Both must combine to make the desertion complete. The intent to desert is usually the principal thing to be considered. Obviously a mere separation by mutual consent is not desertion in either. For, as a matter of proof, can desertion be inferred against either from the mere *323 unaided fact that they do not live together, though protracted absence, with other circumstances, may establish the original intent. The courts have not laid down particular rules of evidence for determining whether a ■separation does or does not, as matter of proof, amount to desertion; and the question does not admit of such rules, but each case must rest on its own circumstances.”
Bearing these principles in mind, we are now to consider whether the evidence sustains the charge of desertion. A brother of the appellant, who was examined as a witness, states that in a conversation had with the appellee in February, 1878, he proposed that the appellee should take his wife and child and go to Kentucky or Texas. The appellee replied there could be no reconciliation between him and his wife; that the matter had gone too far; that they would never live together again as man and wife. I do not think that the appellee by this, intended to avow a purpose on his part not to be reconciled to his wife, or not to live with her again; but rather to convey the idea that the difficulty had proceeded so far as to preclude all hope of reconciliation. The same witness proves that but a few months previous the appellee mentioned to witness their difficulties, telling him he thought his wife was attached to witness and was greatly under his influence, and that he asked witness if he could not bring about a better state of feeling between them. "Witness replied that he did not think he could, that he had never tried to exercise any special influence over his sister in Ms life; that she was perfectly conscientious in everything she said and did, and when she had formed an opinion was firm and uncompromising in it; that he could see no present remedy for their misfortunes; that he sympathized deeply and sincerely with them, and that he hoped time and their mutual interests would produce the harmony that was so desirable between man and wife.
*324 Certainly nothing had occurred to warrant the belief that between the dates of these two conversations the state of feeling between the parties was at all improved or modified. The appellee, in his answer to the averment of the bill, that he was unwilling to be reconciled to his wife, says it is not true he ever refused to be reconciled to her. On the contrary, he has hoped for such reconciliation more than for anything else on earth. He-has never to this dark and miserable hour abandoned all hope that she would yet see the error of her ways, and thus save him from a life of unendurable wretchedness. The evidence does not discredit this declaration; it is in direct response to the bill, and the appellee cannot be denied the benefit of it. In the correspondence between the counsel for the appellant and the counsel for the appellee, respecting their several clients, the latter, in their letter of the 9th of January, 1877, say: “Wo assure you and I)r. Dulaney (it seems a friend and relative of the appellant), most earnestly, that we wanted to settle this controversy first by reconciliation if possible, if not, then by some fair and just compromise.” There is no doubt of the perfect sincerity of this declaration. The counsel of the appellant, in reply, on the same day, after expressing their conviction that there was no possible way of settling the trouble out of court, say: “We cannot close, this letter without again assuring you of our appreciation of your kind and Christian disposition in this case, with which wre have all the time sympathized.” Whatever may be the real state of the case, the inference fairly to be drawn from the record is, that the appellant, and not the appellee, presented the chief obstacles in the way of reconciliation. The fact or facts mainly relied on to show the desertion are that the appellee, in February, 1877, sold his furniture, left the city of Lynchburg, and went to the town of Danville secretly and clandestinely, taking the child with him, without consultation with the *325 appellant, anrl without her knowledge, oi’ consent. The note written by the appellee to the appellant at the time shows that neither his purpose nor destination was cealed. That note informed her that the condition of his business made it necessary he should go to Danville that day; that lie would go to his brother’s house; that for •obvious reasons he took Roy (the child) with him, and that she (the appellant) might follow the next day. Whether he was sincere or not in stating she might follow him, he certainly did not prohibit her from so doing. Possibly he hoped the desire to sec her child might induce her to do so and eventually lead to a reconciliation. Had she followed him, or even written him, and he bad refused to receive her, or provide for her, the entire aspect of the case might have been changed. But, without taking a step to ascertain his purpose, this suit was brought mainly upon the idea that the conduct of the appellee justified the charge of desertion.
The appellee states that he went to the town of Dan-ville for the purpose of attending the United States coui’t then in session, which was no doubt the fact. It is very probable—indeed, it seems to be very clear—he took the child with him because lie feared that if he left it behind the appellant would get possession of it and remove it ■out of his reach beyond the limits of the state. This •apprehension, I think, explains much of his conduct throughout this entire controversy with reference to the •control and management of the child. I attach no sort of importance to the sale of the furniture, because, in view of the separation of the parties, it was of no use or benefit to the appellee.
But with whatever motive the trip to Danville was made, even though a change of residence ■was contemplated, it would not constitute a desertion. All prospect of reconciliation or compromise had then vanished; the counsel for the appellant had declared there was no hope *326 of adjusting the difficulty out of court. It is vain to say that the removal of the appellee to another place of residence, even without the knowledge of the appellant, would constitute a desertion. Even where the parties-separate by consent, neither can complain of desertion in the other unless there is some- desire expressed for reconciliation—some overture made in good faith for a restoration of the conjugal relation. 1 Bish. on M. & D. § 784 a.
In looking over this record it is not very difficult to-find an explanation of the causes which led to the estrangement, and finally to the.separation of the parties. It seems that they differed a good deal with respect to-the management, control and training of the child. Who is to blame upon this point, it is impossible to say. It is very probable that both were wanting in a true spirit of conciliation and compromise. This, however, was not the real cause of the dissension. ■ Its origin lies much deeper. It is manifest that the appellant had made up her mind to bear no more children to the appellee; and in that temper she had denied him access to her bed. This was no mere whim or caprice, but a determined purpose, founded, as she said, upon conscientious convictions. I know it has been suggested that disease was the cause, and the deposition of Doctor Dulaney, her cousin, has been taken to show that during the appellant’s visit to Kentucky in the fall of 1875, he treated her for local affection. But it is most remarkable that during the whole of her sojourn, both in Danville and Lynchburg, which embraces nearly the entire period of her married life, the appellant never required any medical treatment whatever. And nowhere in the record is it pretended or claimed by any of her friends that her conduct, in the particular alluded to here, was the result of local disease, or infirmity of any description. Her counsel, in the eloquent and exhaustive brief filed by him *327 in which he alludes to the subject, does not justify her conduct on any such ground. On the other hand, it is in proof that a short time before her confinement August, 1874, the appellant said to a lady friend she would die and go to perdition before she would have another child; that she considered a women disgraced who had children. She was told if she persisted in that course she would drive her husband away from her, and be the means probably of his going among bad women. She replied, it would be much better, and she greatly preferred it. And in 1876, she told a distinguished physician of Lynchburg she did not intend to have any more children; she knew how to prevent such an occurrence. And upon another occasion, upon being told by him that the differences between her and her husband ought to be settled—they were nothing but words—that she must consent to act as other women did, and allow her husband the privileges which other husbands had, she replied that her conscience would not allow her to do it, without saying why. Her exact language was: “You can’t surely ask me to do a thing which is against my conscience ? ” Doctor Owen says he did not understand her to give even an intimation that ill health w-as the obstacle in the way. He says she was apparently in good health; she looked badly then, but was apparently in good health at all other times.
Against this overwhelming array of facts and circumstances, it was vain to say that the conduct of the appellant was due to disease, when neither she nor her intimate friends, nor her counsel, have ever, at any time, put forth such a pretension.
This is a topic of so much delicacy that I feel the greatest hesitation and repugnance even in alluding to it, much more so in discussing it. I shall therefore dismiss it with the remark that, in my opinion, this has been the main cause of all these troubles—it is this that has cast *328 its shadow over the pathway of these parties, producing controversy, estrangement and separation. In no other does this record explain how it is that two people, remarkable, as their friends say, for their many good qualities, should so rapidly have fallen from their happy estate into their present deplorable condition.
My belief is that the remedy for these troubles is with the appellant; that she is to blame for the evils that have overtaken her, and she cannot ask, with any hope of success, for the aid of the courts so long as she persists in her present views and purposes.
But if the causes suggested be not the real ones—if the true ground is in a want of congeniality of temper and character—it is obvious that the court cannot grant a divorce because the parties cannot live together in harmony and peace. As was said by Chancellor Kent in Burwell v. Saunders, 4 Johns. Ch. R. 502, the law regards the marriage contract as a stable and sacred contract of natural as well as of municipal lawn It is a contract juris gentium, and parties cannot lawfully rid themselves of its duties at the pleasure of either or of both of them. And Sir William Scott, in Evans v. Evans, already cited, says: “ The law has said that married persons shall not be legally separated upon the mere disinclination of one or both to cohabit together. 'When people understand that they must■ live together, except for a few reasons known to the law, they learn to soften, by mutual accommodation, that yoke which they know they cannot shake off. They become good husbands and good wives from the necessity of remaining husbands and waves; for necessity is a powerful master in teaching the duties which it imposes. If it were once understood that upon mutual disgust,'married persons might be legally separated, many couples who now pass through the world with mutual comfort—with attention to their common offspring, and to the moral order of civil society—might, *329 at this moment, have been living in a state of mutual unkinclness—in a state of estrangement from their common offspring, and in a state of the most licentious and unreserved immorality. In this case, as in many others, the happiness of some individuals must be sacrificed to the greater and more general good.”
Before passing from this branch of the case, it is proper to notice a fact much relied on by the appellant’s counsel; and that is, that the appellee himself had brought suit for a divorce from the appellant a short time before the filing of this bill. Whatever may have been the motives of the appellee, or the grounds on which he relied, they can have no sort of influence upon the decision of this case.. Upon this record, as it now stands, the appellee, in applying for a divorce, would have shared the same late as the appellant. Neither is entitled to it upon any or all the grounds stated. Marriage is a contract formed with a view not only to the benefit of the parties themselves, but to the benefit of third persons, to the benefit of their common offspring, and to the moral •order of civil society. Husband and wife cannot, by their conduct, pave the way to a divorce, or by agreement to live separate, entitle themselves to the aid of the courts to make valid that separation. In this state the courts and the legislature have adhered to the policy of refusing •divorces except for a few and weighty causes. Amid the demoralization of the times, and the attacks now elsewhere made upon the sanctity of the marriage tie, this policy has preserved and consecrated the domestic hearth and the domestic circle in Virginia. Holding these views I am of the opinion the appellant is not entitled to a •divorce from her husband.
It only remains to consider the question of the custody of the child. It is manifest that to the parties this is the paramount question. With them the matter of the di *330 vorce derives its chief interest from its bearing upon the fate of the infant, the only issue of the marriage.
The bill charges that the appellee is not a fit and proper person, socially or morally, to have the raising of the child confided to him; and upon that ground it asks the court to decree to the appellant its custody and control.
As a general rule, it would seem that, upon application for a divorce, if the bill is dismissed, the court will decline to interfere either way, but leave the parties to such remedies as they may have by habeas corpus or otherwise. It is only when the divorce is granted that the court goes further and makes such order touching the proper custody and nurture of the offspring, as to it may seem right under all the circumstances. Our statute provides that the court, upon decreeing the dissolution of a marriage, and also upon decreeing a divorce, whether from the bond of matrimony, or from bed and board, may make such further decree as it shall deem expedient concerning the estate and maintenance of the parties, or either of them, and the care, .custody and maintenance of the minor children, and may determine with which of the parents the children, or any of them, shall remain. Code of 1860, ch. 109, § 12. So it would seem that the court in which the divorce suit is pending is authorized under this statute to make an order touching the custody of the minor children only where there is a decree for a divorce.
There is another statute which confers a general jurisdiction upon the circuit, county and corporation, courts in chancery to hear and determine controversies between guardians and wards, to remove guardians, &c., and make any orders for the custody and tuition of an infant, and the management and preservation of his estate. Code 1860, ch. 127, § 13. It has been made a question whether this statute does not relate exclusively to matters of controversy between guardians and wards, and to the custody *331 and tuition of the infants who have estates and thus become wards of the court. See Bev. Code of 1819, p. 406.
It is unnecessary to express any opinion upon either of these points, and I do not wish to be understood as doing so. It may be conceded it is competent for a court of. chancery, in pursuance of its general jurisdiction, for good and sufficient reasons, to make any proper order touching the custody and tuition of an infant; and that this may be done in a pending suit for divorce, even when the divorce is denied. All will concede that this jurisdiction is of the most delicate nature, and to be administered with the utmost caution. 2 Rob. Prac. 154; 1 Minor Inst. 399.
"When the application for divorce is by the wife, and the application is refused, the question of taking from the custody of the husband or father the minor child, is one of great difficulty and delicacy.
The father is the legal guardian of the infant; the law gives it to him against all the world. The right of the father (say all the cases) to the custody of his legitimate minor children, of whatever age they may be, is perfectly clear—too well settled to admit of dispute. 1 Minor Inst. 397, and cases there cited; 2 Kent, 194; Tyler on Coverture and Infancy.
Is this right affected by the voluntary separation of the parents ? If so, to what extent ? Does the mother thereby acquire any additional powers and privileges ? Does the father forfeit any of his? In England the courts have uniformly adhered to the common law doctrines, holding that the father has an absolute right to the custody of his children, and to the exclusion of the mother from all access to or communication with them, however pure and virtuous she might be, and however profligate might be Ms habits. To remedy this evil a statute was passed, known as Mr. Justice Talfourd’s act, which gives *332 the equity courts a very large discretion with respect to the control and possession of the infant children, where the parents live separate and apart. But even under this act the courts still accord to the father the paramount right to the child; and they will not interfere with that right, unless in cases of gross misconduct on his part, or unless the interest or happiness of the child imperatively require it. Wellesly v. Duke of Beaufort, 2 Rus. R. 1, 43; Exparte Bartlett, 2 Coly. R. 661; In re Curtis, 28, L. J. ch. 458.
In a very recent case of Symington v. Symington, decided by the house of lords, and reported in 12 Eng. R. 109, 2 Sch. & D. App. L. R. 415, the subject received a very exhaustive discussion. It was there said: “The father’s right to the guardianship of his child is high and sacred, the law holds it in much reverence, and it should not bé taken from him without gross misconduct on his part and danger of injury to the health or morals of the children.” And further, the court would consider all the circumstances of the particular ease, the circumstances of the misconduct which led to a separation, the circumstances of the general character of the father and of the mother, and above all, the court would look to the interests of the children.
In this country the doctrine is not materially different from that now held by the English courts. The father is universally considered as having claims paramount to those of the mother, his legal authority only yielding to the claims of the infant, whenever the morals or interests of the latter strongly-require it. Whenever the father so conducts himself that it will not be for the benefit of the children to live with him, if his domestic habits, associations or opinions are such as to tend to the injury of his children, the court will withdraw them from him and confer the custody of them upon the mother, or take the children from both and commit them to some *333 third person to nurture and educate. When the child is a daughter of very tender years, and the mother is deemed a suitable person, the custody is given to her, as essential to the health and life of the infant; while in conformity with the English rule the male child is given to the father, except in very extreme cases. In passing upon the claims of the parents, the court will enquire who is most to blame for the separation, giving the preference to the innocent party, because with such a party the infant is most likely to be cared for properly. 2 Bishop on Marriage and Divorce, 582.
In New* York they have a statute equally liberal with the English act conferring upon the courts very enlarged powers with respect to infants when the parents do not live together. It is there uniformly held that the father lias the paramount right to the child in the absence of any positive disqualification for the discharge of his parental duties; that when the wife has separated from her husbam 1 without any sufficient cause, she ought not to have the custody of the child, unless its health and present condition imperatively require it. People v. Humphreys, 24 Barb. R. 526; People v. Brooks, 35 Barb. R. 85. It is also there held that the welfare of the child will presumably be promoted by delivering it to its father, its rightful guardian; and those who maintain the contrary must show the fact. The same view is taken in Ohio. Gishwiler v. Dodez, 4 Ohio n. s. 615.
A very noted case arose in New York some years ago: The People v. Mercein, 3 Hill’s R. 363, 25 Wend. R. 64. An English subject having married a lady of New York, had by her two children, a boy and a girl He wished to go to Nova Scotia to live, but his wife refused to accompany him. It was finally agreed she should retain the girl, and he should take the boy. He returned not long after, and a controversy arose between him and his wife as to the custody of the girl, an infant *334 about twenty-three months of age. The supreme court °f New York decided that the father was entitled to the This decision was reversed by the court of appeals of that state upon several grounds, one of which was that a 0£ suc^ ten(jei, years stood in need of maternal care an¿ attention. Afterwards, when the child had attained the age of four years and six months, the ease was again brought before the supreme court, and determined in favor of the father, upon the ground that the infant could now be delivered to the father, without .injury. The court held that, in cases of voluntary separation between husband and wife, there must be some rule in relation to the custody of their minor children, because without one the matter will probably be determined by violence, and that which the law had established should be followed; that although the court had a discretion in the matter, it was not an arbitrary discretion; on the contrary, the father had a paramount right to the custody of his infant child which no court could disregard in the absence of some positive disqualification on his part. It was not to be presumed, without proof, that the welfare of the child would be pi’omoted by leaving it with the mother. The law has settled the question otherwise by preferring the father. This claim could not be set aside on slight grounds, or because it was conjectured that the interests of the child required it. The court further held that where a wife left her husband without, cause, his right to the custody of the children was indubitable, and should be vindicated, from a regard to the interests of society, not less than of the parents. See Leading Oases in Equity, Vol. II, Pt. 2, pp. 1507-1514 for numerous cases on this subject.
The same doctrines are laid down in Massachusetts in the construction of a statute similar to that of New York—Commonwealth v. Briggs, 16 Pick. R. 203—and indeed in most of the states. See also Johnson v. Terry, *335 34 Conn. R. 259. See cases cited at page 1517, Vol. II, Pt. 2, Lead. Cases in Equity; Anonymous case, 4 Des. R. 94, 102.
In Carr v. Carr, 22 Gratt. 168, this court affirmed a decree of the circuit court giving to the father the custody of a female child of the age of four years, the mother having left the house of her husband without sufficient cause. Judge Bouldin, delivering the unanimous opinion of the court, said: “The conduct of the husband was far from blameless. His conduct towards his young and inexperienced wife was, in many respects, in the highest degree reprehensible. He had treated her with too little tenderness and consideration. He' had been at times coarse, rude and petulant, when he should have been gentle, soothing and affectionate; but as these were not sufficient grounds to justify the wife in abandoning her homfe, this court would not sanction her conduct by awarding the child to her.”
In the case before us the infant is a male child four years of age—not sickly, or feeble—with nothing in its condition requiring the special attention of the mother beyond that of any other infant of like age. As was said by Judge Bouldin in Carr v. Carr, “with it the tender nursing period has passed by, and the time for moral training and impressions has arrived.” The child is now in custody of its father, and was in his custody when this suit was brought. Can we take it from him and confer it upon the mother ? She has failed in her application for a divorce; hut she avers he is not a fit person, socially or morally, to be entrusted with its custody and nurture. Is she sustained by the proofs ? Hpon this, as upon all other questions, we must look to the record, and to the record alone.
The appellee lived in Culpeper for eight or ten years previous to this marriage. Evidence has been taken there as to his character. Mr. James Barbour says his *336 standing was as high as that-of any other young man in the community. He moved among the best people in the town. Ilis moral and social character was without reproach. lie was a man of remarkable amiability and good temper; and (so far as the witness observed) without any tendencies towards dissipation or immorality in his life or conduct. Other witnesses of- the highest respectability, among them the Honorable James G. Field, present attorney-general, testify to the same effect. Dr. Samuel Iiixey says: “Ilis character was good—he was respected and beloved by all who knew him—I never knew a more popular man among his associates here; he was very temperate, and I never knew him to indulge in dissipation of any kind; he was regarded as a very remarkably amiable man, and thought more like a, woman than a man, in that respect.” This is the uniform testimony as to his character before his marriage. The witnesses at Danville speak of him after his marriage as having a very happy temperament—as cheerful, agreeable and playful in his disposition; as affectionate and warm-hearted, as refined and gentlemanly in his deportment, and as respectful, kind and considerate to his wife, and cheerfully disposed to carry out all her wishes. The evidence taken at Lynchburg is that he is a man of good temper, polite, unexceptionable in his manners and conduct—a man of firmness, not impulsive, but quiet; not addicted to any habits of dissipation. Against all this array of testimony there is not a scintilla of evidence except the specific charges of misconduct which have already been fully noticed as unsustaiued by the proofs.
Among all the witnesses examined in this case there is not one, except the brother and sister of the appellant, that proves the appellee ever gave her an unkind speech. They testify to sneers and taunts, and bitter complaints, but nothing more.
On the other hand, it must be conceded the evidence *337 shows that the appellant is a lady of very high character, socially and morally—beautiful in appearance—elegant, accomplished and attractive in her manners—and possessing, in an eminent degree, all those qualities which adorn and beautify the sex. There is also evidence tending to show that she is a person of very pronounced and positive character, and when once forming an opinion, not likely to abandon it. And long before these troubles occurred, lier manner towards her husband was far from respectful, treating him rather as an inferior than an equal.
It is, however, not with the appellant’s character and conduct we have to deal. She is not on trial. All the encomiums pronounced upon her may be conceded to be just. Iso one can justly question her devotion to her child, her anxiety for its welfare. It is the appellee who is arraigned. It is lie who is on trial, wdiose conduct and life are the subject of investigation here. The question is not whether the appellant may be properly entrusted with the custody of the child, but whether there is anything in the conduct, habits, opinions of the appellee which will justify this court in depriving him of the custody of the child, and in conferring it upon the mother. The testimony, as exhibited in this record, is an answer to the question.
In this case all our sympathies are naturally with the appellant; but sitting here to administer the law as we find it established by the wisdom of ages, we are not permitted to indulge our personal sympathies and feelings. For myself, I can say I never read a record with more regret than this. I never undertook to decide a cause with half the sorrow that moves me in this. The evidence, in my judgment, shows nothing, absolutely nothing, to prevent a complete reconciliation of the parties upon terms honorable and acceptable to both of them. JBut this failing, *338 I was inclined to the opinion that suitable provision should be made to secure access on the part of the appellant to her child. Subsequent reflection has satisfied me this cannot be done. If the application for divorce is refused, if we are satisfied that the appellant is the chief obstacle in the way of a reconciliation, and that the appellee is, under all the circumstances, entitled to the' custody of the child, it is impossible to impose terms upon him, and to say he shall be compelled to have the child, under the' decree of the court, at particular places and times, to gratify die wishes and feelings of the appellant.
Another objection made to the decree of the court below is the failure to allow alimony to the wife.
Alimony is an allowance made to the wife out of the husband’s estate or income upon a decree of separation.
In England, and in some of the United States, it'is a mere incident to the divorce, and is never allowed when the divorce is refused, or even upon an independent bill for separate maintenance. The reason assigned is that it is against the policy of the law to make a separate judicial provision for the wife out of the husband’s estate, to be expended apart from him, except in those cases where the separation is sanctioned by the courts.
In Virginia the statutes allow alimony as incident to a decree for a divorce. But this court has gone farther, and held that equity has jurisdiction in an independent suit to decree in favor of the wife in proper cases—as, for example, when she has been abandoned by the husband, or driven from his house by ill treatment, and compelled to seek an asylum elsewhere. In Almond v. Almond, 4 Rand. 662, Judge Carr, delivering the opinion of the court, said: “Suppose the husband turns his wife out of doors, or treats her so cruelly that she cannot live with him; suppose him to persevere in refusing to take her back, or to provide a cent to feed and clothe her. Surely, in á civilized country, there must be some tri *339 bunal to which she may resort. In such a case a court of equity would unquestionably stretch out its arms to save and protect her.”
The difficulty in the present case is that the wife has applied for a divorce, and has failed upon every ground upon which she could rely for a separate maintenance.
I do not mean to assert that there may not be cases in which the courts might refuse a divorce and yet allow alimony. But is this one of them ?
If the appellee is willing to be reconciled to the wife upon terms she can properly accept, if he has not abandoned her, if his conduct has not .been such as to justify her in separating from him, upon what basis or principle is sbe to be decreed the means of living apart from him ?
It may be that the appellee, after the marriage, possessed himself of a portion of her property, but it was done with her consent; and even though without her consent, there is nothing to show he had not the right, as husband, to reduce it into his possession. If the husband, by virtue of his marital rights, obtain the control of his wife’s property, not settled to her separate use, this court has no power to decree its restoration because the parties refuse to live together. Until separated by judicial proceeding they are husband and wife, invested with every right and subject to every duty involved in that relation.
I am, therefore, brought to the conclusion that this is not a case in which the court is authorized to allow ■ alimony.
It only remains, before concluding this opinion, to notice an objection made by appellant’s counsel to certain depositions taken by the appellee. The latter gave notice that he would take depositions at Culpeper Courthouse on the 25th day of May, 1877, and at Danville on the same day. An exception was made on this ground at both places, and these exceptions were overruled by the *340 court below. The mode of proceeding pursued by the appellee in giving such notices was, of course, very ob-but it is difficult to see how this court or the court below,could apply a remedy. The appellant’s counsel ought, upon receiving the notices, to have elected which place they would attend; and the court would have suppressed the depositions taken at the other place, and the appellee would have been afforded an opportunity of re-taking the objectionable depositions. Upon this point the case of Fant v. Miller & Mayhew, 17 Gratt. 187, is a direct authority. Instead of pursuing this course, the appellant’s counsel attended at both places and cross-examined the witnesses, and thus removed all the difficulties arising out of the two notices to take depositions at different places on the same day. I think, for this reason, there was no error in overruling the appellant’s objections.
I have thus endeavored to go over all the grounds, to discuss all the questions arising in this case. It has been my earnest desire to avoid saying anything hurtful to the feelings of the appellant, who has my most sincere sympathies. It is proper to state that the testimony of the solitary negro witness—an old family servant—introduced by the appellee, and the letters of the appellant and her mother, have not been considered at all by me in foi’ming the conclusions now arrived at. Although these letters, in my opinion, have no proper place in this record, I must say I do not concur in the severe denunciations of the appellee because he has thought proper to introduce them. He has certainly had great provocation. Denounced as tyrannical to his wife, charged with adultery and lewdness of conduct, with attempting to debauch his own servant, almost in the presence of his own family, with being a frequenter of bawdy-houses, it is not unnatural that the appellee has exhibited considerable temper and a spirit of retaliation.
*341 All these are the natural fruits of such a controversy. They will pass away with the occurrence which has produced them. Time and reflection, it is hoped, will satisfy hoth parties that their true happiness, and the comfort and welfare of the child, can only be found in that union which has the sanction and pledge of both Divine and human laws.
Anderson, J. I have taken a very different view of ■this case from that which has just been presented. And considering the magnitude of the interests involved, I feel it my duty to give, as fully as I can within the limits of an opinion, the facts and reasons which have brought me to my conclusions.
The defendant, who was temporarily residing in Kentucky, in the year 18G6, found the plaintiff, a school-girl, at a celebrated female college in that state, at the head of her class. She is represented by the testimony as unusually beautiful, and attractive in her person and manners, as amiable and affectionate in her disposition, as well educated and elegantly accomplished, and distinguished for her excellent qualities of mind and heart. She was the daughter of a widowed mother, who was eminent for her virtues. The family occupied the highest social position, and she was trained by her excellent mother to practice the duties which she owed to God and man. She is represented as being the favorite of her teachers and schoolmates, and as being universally beloved and admired in the community in which she lived. And she was in possession of an inheritance from her deceased father, which placed her above want and dependency.
Such was Miss O. Dannie Graves when the defendant, a young man of about twenty-five or twenty-six years, of handsome person and fine physique and pleasing society manners, was introduced to her as a Virgifiian *342 of good social position in Ms native state, and who had done his duty to his state as a Confederate soldier. He succeeded in winning her young heai’t, and after an engagement of about five years, they were married at her mother’s residence in Kentucky, on the 30th of September, 1873. He brought her to the city of Dan-ville, in. the state of Virginia, where they lived until about June, 1875. About that time she returned to Kentucky with her infant son LeRoy, who was horn' on the 17th of August, 1874. After a vist there, she returned to Virginia with her husband, who came for her. He brought her to his brother •’Woodville’s, in the city of Lynchburg, where they stayed about a month. He then took her to board at his father’s, whose family consisted of his wife and four grown maiden daughters. She besought her husband to select some other place for their abode, but unsuccessfully. There it was that this unhappy breach became flagrant.
In December, 1876, Mrs. Graves, mother of plaintiff’, was in Lynchburg on a visit to her daughter, when she received a communication from defendant’s counsel, dated December 23d, 1876, informing her that they had been instructed by the defendant to procure a divorce or separation from his wife. They say: “ We have drawn all the necessary papers looking to a divorce, but have declined to file them in court, hoping that such publicity might be avoided by some private agreement for a perpetual separation.” (Italics mine.) They say further, that they have advised their client that, upon the facts stated, and which he says he will be abundantly able to prove, the court will decree him a divorce a mensa, ei thoro. Their client had actually presented his bill for a divorce, and upon his exparte statement, had obtained an injunction from the judge of the hustings court restraining his wife from removing her child from the state. Krúitless efforts were made by the counsel and friends *343 of the parties to effect a private adjustment; and finally, Mr. Latham, in person, broke off a negotiation with the brother of his wife by declaring to him that there never could be a reconciliation between him and his wife, and that they never could live together again as man and wife. This was on the 16th of February, 1877, and on the 21st following, without the knowledge of his wife, or notice to her of such intention, he moved off to Dan-ville, a city near the border of the state, clandestinely carrying her infant son with him, then just two years, six months and four days old. Before leaving, he dismissed her servant maid and sold the furniture of his wife’s chamber to his mother, as claimed by her, including the bed upon which she slept,* and the next day caused his other effects to be sent after him. It is true he left a note for his wife, informing her that he would leave that day and would take B037 with him, but it was so arranged that the note was not delivered to her until after night, when he was in Danville with her baby. I will have more to say in relation to this note and this transaction.
Mrs. Latham feeling herself thus abandoned b}i her husband, and bereft of her darling child, as her last resort, exhibited her bill in chancer}' for a divorce a *344 mensa et thoro upon the grounds of cruelty, reasonable apprehension of bodily hurt and desertion or abandonment, and for the custody of her child. Her hill was filed on the 2Gth of February, 1877, and was answered by the defendant on the 7th of March following.
Before considering the evidence in support of the allegations of the bill, it is proper that I should consider the charges made hy the defendant against his wife in this most remarkable answer. In. this he occupies the place of assailant; and in the investigation of these charges against the plaintiff, and of the whole case, I feel it to be my duty to strip the case as far as I can of its glosses, and to place those who have acted a part in it in their true light. I have no prejudices or predilections to indulge. The partios and nearly all of their witnesses are strangers to me; I know nothing of them except what I have learned from this record; and it would be more pleasant to throw a mantle over the faults and errors of all than to expose them, if it could be done with justice to the wronged. But the interests involved in this controversy are too great in magnitude to be passed over superficially or in palliation of offences. I feel- that justice requires that the conduct of every one who has acted a part in this unhappy drama should be placed in its true light. Let truth cut its way.
The answer abounds in affirmative allegations of the *345 ■conduct, character, temper and disposition, and principies of the plaintiff, which are exceedingly disgraceful and disreputable to her if true. They constitute defendant’s indictment. The onus is upon him to prove them, and those which are unsupported by evidence are not entitled to the weight of a feather in the decision of this cause. Of this description are the following:
The allegation that the plaintiff called him a liar on a particular occasion whilst they were hoarding at his father’s in Lynchburg. There is no proof of this allegation. He says himself that he said to his wife that “no man, woman or child ever called him aliar before.” But he attempts to establish it by the testimony of a negro woman, which we shall hereafter notice, that she heard her call him a fool and a liar, too, at a previous, time, when they were occupying rooms in Mr. Bugger’s house in Banville, thus contradicting his own declaration. But he admits that he threatened to “punish” his wife.
His allegation as to the cause of his removal from the house of his brother Woodville is not supported by any ■evidence in the record. But the allegation in the bill that it was occasioned by a quarrel between the brothers has some support in the testimony of Mrs. James Lea.
The allegation that respondent wishing to spend a short time with his father who was about to leave home, and his little boy asking to go down with him, his wife, then in a very bad humor, ordered him to leave the child behind, but that he took the child with him, and after a little while she came down, remarking as she entered the room, “ as you have brought the child down here you may have the pleasure of having my company also,” and at once commenced to abuse his father. She denounced him in the bitterest terms, &e. I find no proof in the record of this allegation, and it must be rejected as untrue.
*346 The allegation in which he undertakes to give verbatim a conversation between his wife and his brother "Wood-ville, which was begun by her requesting him not to-speak to her child, &c., is not proved, and can receive no other weight than a sketch of fancy.
The allegation that she threatened again and again to leave him, and take her child, never to return, is unsustained by proof, and must also be rejected.
The allegation that she took from her trunk and showed respondent one of those filthy and wicked publications, in which it is declared that sexual intercourse is not a necessary or proper consequence of marriage, and that she said that they were her sentiments, is not sustained by a particle of proof in the record. Even in her most confidential letters, written with perfect freedom from restraint, and which he has published in this record, an expression cannot be found which indicates in the slightest degree that she entertained such sentiments, or that she had any sympathy with the dogmas known as- “ woman’s rights,” which he ascribes to her. Fortunately for truth and justice, he has furnished us with evidence-of what were her serious views on the subject of marriage, in one of her confidential letters addressed to him during their engagement of October 5th, 1870, before referred to. In that letter she says: “I have always believed that a marriage based on respect, appreciation, sympathy, and above all, devoted and abiding love, is the most sacred and grandest relation of life, and would surely be followed by happiness as complete as any we are permitted to enjoy in life. But I also think most marriages failures; and why? Because the parties entering into it are influenced by unworthy motives, and because husbands being considered superior in station to their wives, therefore being in authority, do not exercise it. aright—failing in the tenderness and consideration which is their due.” She does not object to but recog *347 nizes tlieir position of authority, and only claims that it should be exercised with tenderness and consideration, which she rightly claims is due to the wife. Let the record show how this just claim has been respected by her husband for several months prior to the institution of this suit.
With regard to their contemplated union, having said that before sbe knew what love was she would not have risked matrimony for his happiness regardless of her own, she says: “But now believing that such a union as ours would be, God and his angels would sanction as true, I am willing (not to risk it, for it could be no risk,) to be yours; to travel with you the flinty or flowery .path of life, for I know that only as your wife can joy and content bo found for your ‘ darling ’ (a quotation), and I am satisfied Ghat you will prove to me it is not so great a humbug as I at first supposed.’ ” Again marks of quotation, implying it was a promise contained in his letter. But, alas! what a dark and sorrowful disappointment has she been doomed to experience in a few fleeting years.
The allegation that he has longed for reconciliation with his wife, and that he has never abandoned all hope that she would see the error of her way and save him from a life of unutterable wretchedness, is eloquently expressed by the draftsman, but is not consistent yith bis conduct towards her, is disproved by his conduct and declarations when not employed in the pleadings; nor does it comport with the assaults upon her character in this answer. •
The allegation that his wife, without his permission, when she supposed that all the family were at dinner, tried to leave the house secretly, talcing the child with her, the nurse meanwhile being sent down for her dinner, is not proved. But if she had taken the child with her out on the street, the fact of her having sent for her dinner to *348 be taken to her room, showing that she expected soon to return, was the right of the mother without asking his permission. .And his conduct in going after her and forcing the child from her on the street and bringing it back in despite of her wishes, was ungenerous and unbecoming in the extreme. It was arbitrary, tyrannical-and cruel, and was not calculated to restore the reconciliation which he professes to long for. The pretence that he was afraid she would run off with the child from rhe state without any pre-arrangement for the removal of her clothing and effects, or the child’s, which were in his powder, and a-guarantee against any such vain fear, cannot excuse the outrage. . .
The allegation that he deserted her room upon her command is not proved. I do not think there is any proof that she desired him to leave it; on the contrary, it seems that at the time of her sister’s second visit to her, on the 30th of December, 1876, the day of her arrival in Lynchburg from Covington, Kentucky, Mr. Latham had not then been ordered by his wife to-leave her room, but that at that time he occupied the room with his wife; and it -would seem from what then transpired it is improbable that she would have ventured to order her husband to leave her room, or if she had, that he would have obeyed. It is improbable from what is disclosed by the testimony of Miss Lou. Graves, who I take to be, from her deposition and her whole bearing as it appears in the record, a lady in the highest sense of the word, and a lady of great sell-possession, truthfulness and intelligence. On her arrival in Lynchburg, she says she stopped at the Lynch hotel, and sent word to her sister that she was in the city, and she came to see her. She says: “I went home with her that afternoon; she told me that she wanted to go to see Mr. 'Williams on business, and wished me to stay in the room with Roy while she -was gone and stayall night with her. I told *349 her that I could not stay all night with her unless I asked Robert’s permission, for I did not care to stay in any room but her own, and I would have to ask him to give up his place.”
“Question. Please state whether or not you heard Robert Latham say anything to your sister about your staying all night; if so, what did he say ?
“Answer. When she came back from Mr. Williams’ I heard the parlor door open, and Robert called out in a very loud and angry tone, ‘Is Lou. going to stay here all night ? ’ She (sister) said ‘ Yes, of course.’ He said, ‘Why of course?’ and went in and banged the door.
“ Question. Upon your arrival at their house the evening above referred to, did any of his father’s family speak to you, or make their appearance; if so, who of them ?
“Answer. Ho, I did not see any of them until my sister sent down for the baby, then Miss Mamie came up; she was the only one I saw.
“ Question. Did Robert Latham present himself when you called ?
“ Answer. Ho, I did not see him until I sent for him. When sister came up, after her return from Mr. Williams’,. I asked her to go down and tell Robert that I wanted to see him a few minutes, and after a good while he came up; I asked him if he would give up his place to me that night; he said, ‘Yes, to-night.'1
“ Question. Do you know whether he, or any of the family, knew of your being in the house ?
“Answer. I suppose they all knew it; the nurse went down to bring the baby up and to tell them that I was there; he certainly knew it, or he could not have called out to know if I was going to stay all night.
“Question. Were you at the house at supper-time; if so, were you invited to supper, or was your supper sent to your room ?
*350 “Answer. Yes, I was there at súpper-time, but was not asked to supper, nor whether I would have any sent to me. Yone was sent to me.
“ Question. Did you stay all night; if so, when did you leave there ?
“Answer. Yes, I stayed all night and left there about eight o’clock the next morning, before breakfast, and went to the Lynch house to breakfast.
“Question. "Were you invited by Robert Latham or any of his family to stay to breakfast or to return again ?
“Answer. I did not see Robert again, nor any of the family, nor was I invited to breakfast, or to return again.
“ Question. Did you pay any subsequent visits to your sister while she remained at Robert Latham’s father’s ?
“Answer. Yes, I was there almost every day until I was shut out of the house and refused admission.”
I have deemed it proper to give the foregoing literal .transcript from the deposition of this intelligent and reliable witness to show not only that Mr. Latham was not denied by his wife, at that time, access to his wife’s chamber, but that his right to it was unequivocally recognized by his wife; but also to show what was the temper and disposition of himself and his father’s family towards his wife, which is still more fully developed in the progress of the cause, as we shall see in the course of this opinion. But enough has been shown of the conduct and disposition of the wife and of the husband to repel the allegation, of which there is no proof, that he deserted her room upon her command.
His allegations that she is unfit to have the control and training of her child on account of her unwifely and unwomanly course and her unbridled temper, and the disparagement of her affection for her child, is not only *351 not proved, but is disproved by the overwhelming weight of evidence in 'the cause.
A very considerable part of the defendant’s answer •consists of transcripts of letters written to him in strict confidence by Mrs. Graves, the mother of his wife, and which she directed him to burn, but which he preferred to keep in violation of her injunction, and has presumed to break the seal of confidence, as he did in the case of letters written to him by the plaintiff' during their engagement and before their marriage, with the confiding spirit of trustful love and innocence. I had siipposed that if there was any one sentiment upon which society was agreed it was that the seal of confidence ivas sacred, and could not be broken without dishonor. The letters of Mrs. Graves were doubtless written upon representations made to her by defendant, in whom she then had confidence, which impressed her with fears that her daughter was to blame for the difficulties she had with her husband; and they were written to conciliate and to entreat his forbearance, in strict confidence. But it is evident that Airs. Graves had then heard only one side, and I think this is clearly shown by the record. The love which the plaintiff had for her husband, notwithstanding her ill treatment and her desire to couceal his faults from her family, and her refined sensibility and womanly pride prevented her from communicating to her mother and sister his ill treatment of her, until it had become unsupportable and flagrant, and probably not until after she had been informed that her husband was seeking a divorce. (See Lou. Graves’ deposition.) After she had talked freely with her truthful daughter and had obtained from her a true representation of the facts, Mrs. Graves entirely changed her opinion. But these letters which the defendant had drawn from the mother he preserved, and by breach of confidence incorporated in his answer, and then offered them as evidence against his wife. But *352 they are not evidence against her, as was rightly held by the court below, and were improperly transcribed iu his answer, and ought not to be read, and if read ought not to have the slightest influence in the decision of this cause.
The plaintiff charged in her bill that before they went to Danville the defendant required her to conceal her want of sympathy with his political course. She says the shock was great to her when she found, after her marriage, that her husband, whom as a girl she had admired and honored as one who had done his duty to his native state in arms, and whom she supposed to be still true, had in fact allied himself with what are. known in Virginia as Radicals, &c. The defendant in his answer avers that it is not true that the complainant was ignorant of his political relation; and he avers that before he sought the office he now holds he consulted her wishes, and she advised him to seek it, and that the second time he met with her she was a guest in the house of the most decided and out-spoken Republican in all that section of Kentucky, then on a long visit to his daughter, the most intimate friend she ever had. This might all be so—but there is no proof of it in the record—yet it is not responsive to the allegation of the bill.' The vice charged was not political, for doubtless honorable and patriotic men are Republicans; hut the shock and mortification to her was to find that her husband had not been true; that he had deserted his friends with whom he had made common cause, and with whom he had been confederated during the war, and had gone over to the enemy and joined him in waging a more cruel war against them than the war of arms whilst arms remained. It was the perfidy—the moral taint—which she felt attached to him, and which would likely exclude him from the best society of the state. It was the idea that *353 lier husband was not true that caused her the shock and sense of humiliation.
And now it was, when her husband was about to introduce her at Danville into such associations, she says that he required her to conceal her want of sympathy with his course. Such would naturally have been his wash, but he denies it, and it is not susceptible of proof. But he shifts the subject and introduces another couut into his indictment, and charges her with holding the principles of “woman’s rights” and “strong-minded women,” and says he advised her to conceal from, his mother and sisters her opinions on that subject, as it would injure her in their estimation. These are affirmative allegations, and the onus is on him to prove them; yet in this whole record there is not a syllable of evidence to be found— not even in her most confidential letters, which he has broken the seal of confidence to spread upon the record—to indicate that she ever entertained such sentiments, or a sentiment allied to them. He attempted to prove it by Miss Rose Allen Heal, whose love for him and hatred for his wife would not have inclined her to conceal anything that would' have been to her prejudice, but wholly failed.
He charges that she refused to cultivate the good will and friendship of those who sought her acquaintance in Danville, and habitually showed, and in her letters to respondent’s family expressed, her dislike for the most intelligent and refined citizens of Danville who called to see her.
From the genial, refined and cultivated society in which she had been reared defendant transferred his beautiful, refined and elegantly accomplished wife to a society at Danville composed, in the main, of his political associates, their families, dependants and retainers: an association with which she had no sympathy, and., *354 which want of sympathy he doubtless felt it was desirable she should conceal from his associates. -And this he construes into a refusal to cultivate the good will and friendship of the most refined and intelligent citizens of Danville. And to establish this charge he produces certain letters written by her to his mother. These letters show upon their face that they ivere written in confidence, with perfect freedom from restraint, often carelessly, sometimes jestingly and playfully, as one writing to a trusted friend who would be ready to overlook any indiscreet ior thoughtless expression, or e,ven erroneous sentiment, as merely the suggestion of the moment, without due consideration—the writer just dotting down her thoughts as they were suggested the moment of writing, feeling that they were communicated only to one who appreciated her and who would be ready to make allowances for all errors and mistakes, and that what she wrote would he communicated only to the friend to whom it was confided, and would go no further. Private letters thus written by the plaintiff to the mother of her husband were preserved by her and given up to her son, who, disregarding the circumstances of confidence under which they were written, has exposed them to the public view, by spreading them upon this record, and has made them evidence in this case.
And they prove not what the defendant claims—her dislike for the most intelligent and refined citizens of Danville and her refusal to cultivate their good will and friendship—but her opinion of many of those, it may be the mass of them, whom the defendant desired to introduce to her friendly association, and whose friendship he desired her to cultivate. She is evidently a woman of penetration, and whatever her opinion of those people to whom she refers is worth, he has made it evidénce. And the opinion she formed of them was so unfavorable that it is not strange that she was not disposed to cultivate *355 them. This was not so with regard to all the ladies and gentlemen with whom she met in Danville. Doubtless there were many as refined and cultivated people Danville as those in whose society she had been reared and educated; with but few of íbera, it would seem, she liad an opportunity to cultivate an intimate association. Such were Mrs. Dice, Mrs. Carrington, Air. Dugger and his family, Dr. and Mrs. Martin, Airs. Gravely, and doubtless there were others; hut as proved by Air. Dugger, Mrs. Carrington, Airs. Dice and others, she was polite and’respectful to all. She would be so through respect for her husband; but whilst she was so, in her freo and unrestrained correspondence with her husband’s mother, she expressed her private opinion of many of them; and she must have been impressed with a horrible idea of their grovelling nature when she compares them to “hshing worms.” She calls them “fishing worms,” and apologizes to her mother-in-law for the use of that expression, saying: “D. (her husband) taught me that bad word.” It would seem from this that he had no better opinion of them than she had, and yet he complains that she refused to cultivate their good will and friendship. She speaks of these calls on her as having been a perfect bore.
But there were exceptions. There were many, numerous exceptions in the society of Danville, with a few of whom, in her new relation, she was thrown. And in this letter she expressly mentions Dr. Martin and his wife, and speaks of Mrs. Martin as “ charming.” AVe know from the record there were others with whom she was associated on the most intimate terms. One is mentioned by Miss Lou. Graves. In answer to defendant’s question, upon her cross-examination, she testified that on one occasion, when her sister was on a visit to her mother, in 1875, she entered the parlor and saw they all looked a little disturbed. She asked what was the mat *356 ter? Her sister, she thinks it was, said that she had made a remark about her friend Mrs. Gravely of .Dan-ville, that she thought she was one of the most refined ladies that she ever saw, and that Eobert had said that was as much as to say his mother and sisters were not refined, and she told him that she had no reference to his mother and sisters, or to any one else; that they were not even in her mind. I think we may fairly conclude, therefore, that her visitoi’s, to whom she refers in her letter to her mother-in-law, did not embrace the intelligent and ]’efined citizens of Danville, but only those-who were not embraced in that description, to whose association her husband had introduced her. Nor does-it show that she refused to cultivate their good will and friendship, although she had no sympathy or congeniality with them. It is only her private opinion of them, expressed in a letter, not addressed to a mere acquaintance, but the mother of her husband, in whose bosom she then felt free to confide every thought and feeling of her heart, as I think the record abundantly shows. But whilst her opinion of them was so unfavorable and their calls were a bore to her, she may have felt it her duty, through respect to her husband and her own good breeding, to treat them politely and with respect; which it appears from the evidence in the cause she did.
I have now travelled over the bulk of this most remarkable answer, and there remain but few items yet to consider’, but they will 3’equii’e. careful consideration.
He alleges that his wife’s “temper is oftentimes so irritable and sometimes so morose and gloomy that respondent has often suspected that possibly her mind was unhinged.” If so, it should have excited his sympathy and compassion instead of a disposition to crush her and to overwhelm her with ignominy and disgrace. The evidence, however, shows that he had no ground for such an apprehension.
*357 But making a sudden departure from that view, he •charges that “it is habitual with her to see only her own interest, utterly to disregard the rights and feelings of others, and to magnify beyond all reason any infringement of her rights, as she sees them, and any offence or slight received from others, and she prides herself on her inability to forget or forgive an injury.”
The above is a very grave charge. It is a charge of moral depravity of a heinous character. It involves a charge of uncharitableness, want of candor, injustice, dishonesty and gross malevolence. This is the first branch of this count. The second is as follows, viz: that “though she has often confessed that she was wanting in ordinary maternal affection, and has declared that she looked upon her child as a curse which Providence has inflicted upon her,, yet she has insisted on the exclusive control and management of that child, declaring that respondent, as its father, had no rights in the matter, and that its management should, under no circumstances, and to no degree, be interfered with by him.” And he adds that “she not only hates her husband, but has sought to make his little child look on him as the vilest creature of the earth.” I will say at once that in my opinion, alter a most thorough and careful reading and analysis of the evidence in this voluminous record, not one of these charges is sustained, and the just tribute to the character of this lady, in the opinion of the majority of the court, repels them.
But let us consider the evidence in relation to the first branch of this allegation. I will first examine the testimony relating to the plaintiff’s conduct and character whilst domiciled by her husband at Danville in the society to which he sought to introduce her whilst there, to which I have before alluded. And first the defendant’s depositions in support of the charge.
Mrs. Susan Allen, with whom the defendant and his *358 wife first boarded in Danville about four months, is a relative, and seems to be a warm personal friend and of the defendant, and is his witness. Even she testifies that Mrs. Latham was “respectful” to her husband. She says: “I never saw her disrespectful, but never saw any great display of affection.” And she discreetly adds, “that is not usual with ladies; ladies who> have great affection frequently fail to show it.” Consequently, unlike Mrs. Edmonia 'Washington, another of defendant’s witnesses, she did not conclude they were not affectionate, because “she did not see them kiss and hug.”
Mrs. Allen was asked upon her examination in chief to give her opinion of plaintiff, as formed from her association with her during her stay; and she undertakes to give it upon a four months’ acquaintance, which seems not to have been at all intimate.
Most likely* this hostess thought, when the young bride came to live with her, that she would be very yielding, and that she should take the direction of her and mould her to suit herself, particularly as she was the friend and relation of her husband; and she found herself disappointed. She found that the young bride had an opinion of her own and was not willing to be moulded, and acted toward her, not as an invited guest, which she was not, but as a pay-boarder (which she was) had a right to act. And it is not unlikely that the hostess felt, not only disappontment, but chagrin and mortification, and she concluded that she was a woman of unyielding will, great self-esteem, extremely selfish, and thinks she does not appreciate a kindness. But this, as bad as it is, does not come up to the charge. If this woman was correct in her opiniou, which evidently she is not, it is not that ‘«‘it is habitual with her (the plaintiff) to see only her own interest, utterly to disregard the rights and feelings of others and to magnify beyond all reason any infringe *359 ment of her rights, as she sees them, and any slight or offence received from others, and she prides herself on her buibilitg to forget or forgive an injury.” The character thus described, and ascribed to the plaintiff by the defendant, is not sustained by this witness either in the facts or the opinions to which she testifies. It falls far short of it. She admits that she was kind and respectful to all in her house, except in two instances which she refused to explain. And what is more to the point in this suit, she admits that she was respectful to her husband; she never saw her otherwise'.
Mrs. Eose Allan Neal, a daughter of the aforesaid Mrs. Allan, who saj’s she is a third or fourth cousin of Mr. Latham, and his friend, expresses pretty much the same opinion that her mama entertains of Mrs. Latham, She thought Mrs. Latham tyrannical and exceedingly vain. Tyrannical, because she insisted on having a tin set for her chamber, and a grate instead of a stove, and a wardrobe; and particularly because as soon as she got one she insisted upon having the others. And she thought she showed her vanity by her manners and the care she took of herself and her appearance. Is it remarkable that a young lady, and particularly a bride, should be particular in her toilet and endeavor to make a good appearance ?
We next come to the deposition of Mrs. Isabella Lewis, wife of assistant United States attorney for the western district of Virginia. Mr. Latham took his wife there next to board. She seems to be very much embittered against Mrs. Latham. The main causes of offence, as I can gather from her deposition, are, because Mrs. Latham required her chamber to be cleaned out neatly and thoroughly eATery morning, and not merely once a week on Friday mornings, and kept the chamber-maid employed as long as it was necessary to have it well done, when she, the hostess, needed her; and moreover, because she *360 cutout her work in the parlor; and because, when she sent for her to call her to account for sending her a mes-which she says was unlady-like, though she does not tell us what it was, Mrs. Latham acknowledged that a^e genj. mesgagej alld jn rather plain terms told }ier to her face what her opiuion was of her, to-wit: “that she was a perfect tyrant, and that she had not only ruled her, but every one on the lot, with a rod of iron.” That was too much for Mrs. Lewis to stand, and she formed a very unfavorable opinion of her character, but it seems not more unfavorable than Mrs. Latham had formed of her. In answer to the defendant’s seventh question-in-chief, she says: “ She only made one exhibition of temper in my presence,” which she afterwards somewhat varied. And she concluded that she was a vey high-tempered woman and a very exacting woman; but she says she never saw Mrs. Latham display any temper towards her husband. This is the only point of her testimony bearing on the main issues, and yet I think if the record vindicates the character of the plaintiff from such aspersions, it is due to an injured woman that it should so appear. Her testimony, though splenetic, also falls very far short of ascribing to the plaintiff the infamous character which the defendant’s allegation imports.
Then we have the deposition of Mr. H. S.' Lewis, assistant attorney of the Hnitecl States for the western district of Virginia. His feelings were; of course, not very amiable towards Mrs. Latham, after learning the grievances of his wife, if there was not a deeper seated cause of ill-will in him. He could not say that he ever heard Mrs. Latham speak an unkind word to her husband, but he thought her bearing was that of a superior to an inferior, and that her expressions were sometimes contemptuous; but he refused to give any instances. TYom her conduct towards those in the house with her, *361 he considered her to be a person of high temper, though he could recall no particular facts that induced him to form that opinion. The deposition of this witness, though like the others showing strong prejudice, fails to sustain the defendant’s charge in its atrocity.
Then we have the deposition of Mary J. Waldron. She is the witness who was hunted up by C. P. Latham, clerk of the United States district and circuit courts at Danville, and brother of defendant, and who got his wife to write out her affidavit and sign her name to it. Her deposition shows that she knew nothing prejudicial to the plaintiff, whilst it shows at the same time a great disposition to say something, and a desire to conceal and cover up what she seemed to think would be prejudicial to her friend. But it really amounts to nothing, and I dismiss it with that remark.
As countérvailing this testimony and proving the falsehood of this atrocious charge, we have the following testimony: Ohrissv Hairston’s deposition is very conclusive as to the propriety of Mrs. Latham’s conduct to all, and her respectful and affectionate deportment towards her husband whilst they boarded at Mrs. Allen’s, which is consistent with her deportment whilst they hoarded at Air. Lewis’, and lived at Air. Dugger’s, as proved by Airs. Rice, Airs. Carrington and Air. Dugger.
Mrs. M. J. Rice had a room in Mr. Lewis’ house at the same time Air. and Airs. Latham boarded there, and saw a great deal more of them than Mr. or Airs. Lewis. Their rooms were only separated by the hall or passage. She saw Air. and Airs. Latham very often every day, sometimes three or four times a day. She add Airs. Latham were in one another’s room, off and on, all during the day, and witness was often in her room at night. And she testifies: “I never saw Airs. Latham out of temper in my life; they, her husband and herself, were *362 just as kind to each other as they could be. When I heard of the difficulty between them, of their trying to get a divorce, I thought it was a joke, and didn’t believe it until I was told that it was so, because I never heard them speak an unkind word to one another in my life.” She says she remarked to Airs. Harvey several times, that she thought they were a happy couple together. She visited Mrs. Latham after she left Lewis’, at Air. Kingsley’s, and also when she kept rooms at Daniel Dugger’s.
Airs. Ellen A. Carrington, whose high character is known to at least one member of the court, who lived in the same house in Danville with Airs. Latham (Mr. Danigl Dugger’s) for seven months, testifies as follows: “I saw her from four to six times a day. I always found her to be a lady'of the greatest delicacy and refinement of feeling, exceedingly kind and polite to every one in the house, and had the very strictest regard for the truth. I never knew her to give way to any bursts of temper on any occasion, but she was always amiable and gentle and very kind to the inmates of the house who were sick.” Doth of these ladies had the best opportunities of knowing Airs. Latham, of witnessing her deportment, and of forming a just opinion of her character. Mr. Dugger, in whose house she lived for about seven months, testifies that so far as he knows anything abput it, “ her conduct was that of a high-toned lady.” As to her disposition, he says: “ I regarded Airs. Latham as a lady of decided will of her own, at the same time I never saw anything in Mrs. Latham that ivas not in entire harmony with her husband.” He says she was regardful and considerate of the feelings and the rights of those around her, as far as he knew. He says she was pleasant and agreeable to his own family and others about her. The testimony of these highly respectable witnesses falsifies this atrocious charge/and so does the testimony of that eminent divine and excellent gentle *363 man, Dr. Allen Martin, whose church she regularly attended, though' not a member, and to whose Bible-class she belonged, and whom he visited frequently. He tersely says: “I regarded her as an amiable, well-principled, high-bred lady.” He saw her with her husband occasionally during his visits and at other times, and on such occasions, he says, “ her conduct was wifely and lady-like.”
And such was the opinion formed of her character by the ladies of Lynchburg who became acquainted with her after her removal to that place, as appears from the testimony of Mrs. Ella II. Eord, Mrs. Eliza Boyd, Mrs. Marion C. Tyree and others. The latter says: “ I will say she is not only womanly, modest and refined, but honorable and truthful in a high degree. I'have always been struck with her truthfulness.” And the estimation of her character formed by these respectable witnesses, comports with the character given her by people' of highest standing in Kentucky, gentlemen and ladies, in the midst of whom she. was reared and educated, and who knew her from infancy.
But the limits of an opinion will not allow me to do more than to compress the testimony of these witnesses, which shall be, for the most part, in their language. The following traits of character are established by their testimony: Her truthfulness: “ Her love of truth was a part of lief.” “Kever knew her, as a girl or a woman, to prevaricate, and she had a contempt for one who would.” “She was sound in morals, brought up by Christian parents, and was fcrfecthj just and conscientious.” “ She was a girl of strong individuality, decided in everything, nothing negative about her, high-toned, courageous and true in every respect, scorning what was mean, little or under-handed.” “Kemarkable for her kindness to old persons and desirous to do all she could for their comfort;” and for “her love for children, her *364 gentleness and tenderness with them. They always loved her.” “She was a favorite with her teachers and at the head of her class.” “Her moral and intellectual qualities were of the highest order, as were also ke]> education and accomplishments.” In respect to her moral qualities, she was a woman of “ chastity, integrity, purity, charity, justice, truth, conscientiousness, refinement, cultivation, attractiveness and right feeling toward her Creator and her fellow-man ? ” “A true woman, of sterling constancy and fidelity.” Just the reverse of the charges under consideration, and proves them to be false and slanderous,
“In respect to her mental qualities, she has a mind of unusual natural vigor and brilliancy, developed by careful training to well-balanced reliant action.” “She is a woman of independent thought, untramelled by ignorance, superstition or prejudice, yet not erratic or unreasonable in her will, actions, or motives.” She is a woman who feels sorrow or grief keenly, though she may appear cheerful. In disposition she was affable to all, though reserved as to her personal affairs. Her character was of the highest order. She excelled in music, both vocal and instrumental; and, one of her classmates says, “in everything she undertook.” “Her personal appearance was very striking. She was unusally beautiful; ” and was in her manners and mental culture, in the language of one of her teachers, “ an elegant young woman.” “She had many friends at Shelbyville, by whom she was loved and admired, and in fact by the whole community.” Such is the tribute to her loveliness of character and person and eminent virtue, by the testimony of nine witnesses, gentlemen and ladies of the highest standing in their state, who knew her from her childhood, and who knew how she was appreciated by the people amongst whom she was born and reared. How different the portraiture they *365 have given of her from that infamous one drawn by the defendant, and how differently she is esteemed by these intelligent and respectable witnesses, who have her all her life, and by Mr. and Mrs. Lewis, and Mrs. Allen, and Mrs. Eose Allen Heal, though they fell far short of proving defendant’s atrocious charge. Yet looking at her through a jaundiced medium, she appeared to them in a different light from the true light in which she appeared to all the other ivitness who have testified at Danville, Lynchburg and Kentucky. It is worthy of note that not a witness in this cause has testified in any manner to the disparagement of the plaintiff’ who was not connected in some way with the defendant’s coterie of friends and political associates, unless Mrs. Edmonia Washington should be excepted.
We come now to consider the other branch of this count in the indictment. It is in substance:
I. That she has often confessed that she was “ wanting in ordinary maternal affection.”
II. That “ she has declared that she looked upon her ■ child as a curse which Providence had inflicted upon her.”
HI. That “ she has insisted on the exclusive control and management of that3 child, declaring that respondent, as its father, had no rights in the matter, and that her management of it should, under no circumstances and to no degree, be interfered with by him.”
TV. That “ she not only hates lier husband, but has sought to make his little child look on him as the vilest creature of the earth.”
These are grave charges. We will not consider them in their exact order, but will proceed to enquire, Pías the defendant sustained them by evidence? The onus is upon him.
To support these charges he introduces as a witness a negro woman by the name of Edmonia Washington, to *366 whom I have before alluded. This woman had been employed by Mr. Latham as a cook and nurse, whilst they had rooms at Mr. Dugger’s, and the conversations with Mrs. Latham, which she professes to detail, she regj.esen^g occurred during the time Mr. and Mrs. Latham had rooms at Mr. Dugger’s. She represents Mrs. Latham as “sitting down, talking like anybody else in the roomthat is, as I take it, putting herself on an equality with her, and saying to her that her love for Mr. Latham was getting weaker and weaker, and “that she didn’t love enough to bo married no how; that she ought not to have married.” She said she didn’t bring any particular charges against him, but “said she thought he loved his mother better than he did her.” Some time afterwards, upon her cross-examination, in answer to the question, “lias she ever told you she thought he loved his mother more than he loved her ? ” she answered: “She never told me anything about that; she said once that she thought he did pay more attention to his mother and sisters than he did to her, but she never told me that he loved his mother better-than he did her.” At this point in' her deposition it appears on the record, that the counsel turned to her examination-in-chief to see if she had not directly contradicted what she had testified in her direct examination, which she observing, added: “There was one time she said she “thought he loved his mother and sisters better than her, and she wanted to go to Texas,” &c., thus testifying backwards and forwards. Now, it will be remembered that she professes to be detailing a conversation which took place while they lived in Danville, in the house of Mr. Dugger, before they -went to Lynchburg, and when they had been very little with Mr. Latham’s mother and sisters, when kindly and affectionate relations existed between them and Mrs. O. Fannie Latham, and she could have had no cause of jealousy, and when it is *367 shown by the testimony of Airs. Rice and Airs. Oarrington that Air. and Airs. Latham were very happy in their married life; which is fully confirmed by the raneous evidence of her letters which the defendant has spread upon the record. And the language which she attributes to her, that she didn’t love enough to be a married woman, is in conflict with the affectionate mark tal relations subsisting between her and her husband at that time, as abundantly proved, and about which there is no difference of opinion in the court, and also with the evidence of her devoted love to the defendant, by her constancy and devotion during their long engagement, under circumstances of great trial, and by her letters to the defendant during that period, which he has made evidence in the cause.
She says she heard her call him a fool and liar, hut in ths she contradicts the defendant himself, as we have seen, for long after this he says he told his wife that no man or woman ever called him a liar before, and it is contradicted by the whole testimony as to their deportment towards each other whilst they' occupied rooms at Air. Lugger’s. All her statements about the temper the plaintiff exhibited towards her husband during this period are contradicted by all the witnesses who, testify as to this period, both the plaintiff’s and the defendant’s, except L. S. Lewis, and his testimony yields it no support.
She further testifies that she told her during this same period “ that she did not love children as other mothei’s did; that she did not have that tender feeling for them like other mothers; that she loved it well enough to make clothes for it, and keep it comfortable and feed it. She said it was a curse sent upon her from the Almighty,” &c. How, at the time this woman says these declarations were made to her by Airs. Latham, Airs. Rice testifies: “ I never saw her treat it (her child) amiss in my life, and thought she was perfectly devoted to it. I don’t *368 think I ever saw a mother more 'devoted to a child than she was to hers when I saw her at Mr. Dogger’s.” Mrs. Carrington, who lived seven months with Mrs. Latham, all the time this witness was a cook and nurse for her there, sajs: “I saw her with him (her child) daily and constantly, and never witnessed tenderer care and devotion from any woman. And I also saw her with it when it was sick, and she nursed it untiringly. In its sickness she was extremely anxious and attentive.” Dr. Martin, her pastor, testifies that “I saw her from time to time-with her child (it was during the samé period); on such occasions she impressed me as a devoted mother. She-appeared to me to he a mother proud and happy in her child.” And yet this unscrupulous servant-woman swears that during the period to which the testimony of these respectable ladies and Dr. Martin relates, Mrs. Latham told her that this child, which the foregoing testimony, and in fact the overwhelming weight of testimony, in the cause, proves she most tenderly loved, and in which she took so much pride, “ was a curse sent on her from the Almighty.” If the character of our wives or sisters or daughters are to be tested by such a witness, there would be no security to the most exalted character. And yet this is the only testimony in the record to support this allegation of the plaintiff. The allegation must have been made upon information from this witness that she would swear to it; yet she swears that she had no conversation with him, with his father or brothers, during the two months she was with them in Lynchburg, or before, as to what would be the character of the testimony she would give in the cause. It is incredible, as is her whole story. It is not only unsustained, but it is in conflict with the established facts in the record.
As to the specification, which I have designated as Do. 1 in the charge, “ that she had often confessed she was deficient in maternal affection,” there is not a particle of *369 testimony, if we throw out the deposition of Edmonia Washington, which I feel bound to do, as utterly unworthy of credit. And there is no evidence of having often made such confession, or at all, but the evidence is overwhelming, not only conclusively to show that she is not deficient in maternal affection, but that her maternal affection was intense and absorbing.
Miss Lou. Graves, sister of the plaintiff—whose clear, intelligent, consistent, calm and unimpassioned testifying in this case, and her ladj'-like deportment under a rigoious and scrutinizing cross-examination, which was not at all times courteous, in which she sustained herself throughout, I confess inspires me with great confidence in her testimony, and great respect for her character—was called on to testify as to the affection of her sister for her child, and her treatment of it. She was asked to state whether her sister was regardful and anxious of the welfare of her child or otherwise. Her answer is: “Yes, she has always been so. She seems to be miserable if she does not know7 where he is, and whether he is happy and comfortable. She has always been so since I have known her, with her child. There was never anything which she could contribute to its comfort or happiness which she did not do. She vras perfectly self-sacrificing, never thinking of her own comfort or rest, hut giving up all to him. It w7as always her habit even to wash his flannel clothes for fear the washwoman might spoil them.
She always washed and dried his hair herself, and took care that the water for his bath was of the right temperature. She always took the greatest pains in cutting and fitting his clothes, so that they would be perfectly comfortable. She wrould never leave him by himself, and would stop anything in the world she was at in order to play with and amuse him, often when she w7as too tired to do so. I would often beg her not to do it myself. *370 When she was at our home in Kentucky, we would often try to persuade her to leave him a day and go to places: Cincinnati Exposition, &c. I offered, and mother offered to stay and take care of him, but she would not go unless she could take him with her.”
To the same effect, and with at least equal force, is the testimony of Mrs. S. Willie Lyle, Dr. J. J. Dulaney, Mrs. Belle Buckner, Mrs. Mary E. Graves, of Kentucky, and Mrs. B. L. Owen, wife of Dr. W. O. Owen, of Lynchburg, who says: “ Erom little incidents I know, I judge she is a vei’37 affectionate mother.” And Mrs. O. M. Jordan, who testifiés: “ I have never seen a more tender, loving, devoted mother.” Mrs. Lyle says: “ She fondled and nourished him herself; she washed and dressed him, watched him, slept with him and sat awake with him in her bed several times at night (whilst she was with her), holding him asleep in her arms, because he did not sleep well when laid on the bed.” I might refer to other witnesses who testify as strongly, but it is sufficient to say that the testimony from Danville, Virginia, Kentucky and Lynchburg, abundantly shows that never was a mother more ardent in her affection and devotion to her child. He seemed to be her pride and joy and the light of her life, and never did mother exhibit a more anxious and earnest desire and purpose fully to meet her responsibilities for his right training and treatment, morally, intellectually and physically. We look in vain in this record to find any evidence that she was wanting in ordinary maternal affection, or that she had ever made such a confession, which the whole record shows is not true.
Hor is there any evidence to support the other allegations, that she insisted on the exclusive control and management of the child, declaring that his father had no rights in the matter’, and that her management of it should, under no circumstances and to no degree, be *371 interfered with by him, and that she hates her husband, and has sought to make his little child look on him as the vilest creature of the earth. We look in vain in this record for the slighest proof in support of these charges, hut we find much to disprove them.
All the witnesses, both for plaintiff and defendant, who testify as to her deportment towards him while they lived in Danville, say they never heard her speak an .unkind word to him or of him. And after she left Danville, to spend four or five months in Kentucky, the testimony is that she invariably showed respect and affection for her husband; and after they went to Lynch-burg the testimony is that when she spoke of her troubles to her friends, she spoke with leniency of her husband and sought to apologize for his conduct.
Mrs. Ella II. Ford sajs,.. that when speaking of her troubles, she would speak with leniency of her husband, and say she thought he would not have acted so if he had not been influenced by others. She says: “I never heard her speak harshly of him or reproach him.” The testimony of Mrs. Doyd and Mrs. Tyree is to the same effect. Miss Sue Matthews, one of her most intimate friends, with whom she has had regular correspondence both before and since her marriage, says “ she loved him devotedly and was almost blinded to his faults. Kot once in all the long years (alluding to their long engagement, I suppose), did her feelings change. She believed in him implicitly, never doubted him, but was perfectly true to him, as she was in everything else. * # * Since her marriage she has always spoken of him in the most respectful, loving manner until this unfortunate affair; and never since has she said anything unkind of him in any of her letters—not even since this suit began; but .she has shown herself the true, noble, lovable woman she is under all trying circumstances.”
We come now to the consideration of the last count *372 in this remarkable indictment of a husband against his wife, which will disclose (without considering the influence which questions of property may have had, as indicated by the remark made by the defendant’s mother to Miss Lou. Graves, and the enquiries as to property made by the defendant of the plaintiff’s brother, and the cross-examination of Miss Lou. Graves by defendant on the question of property), the probable origin and chief cause of the cruel treatment which this unfortunate lady has received from her husband. He charges that for months before this controversy became flagrant, and, with short intervals, for long periods before, that she had refused respondent access to her bed, sometimes on one pretext and then on another, but finally on the ground of her sovereign will and resolution, never again to bear children by him. A pretty complaint for a man to make to a court of justice against his wife! If it was true, why didn’t he put her privately away and let her take her child with her? How much better, more manly and magnanimous and noble, than, to come into a court of justice with this indelicate complaint on his lips against his wife. But as it has been made, indelicate and unpleasant as it is, we will have to look into it and get at the truth, if we can. Why didn’t he let his wife go and stay with her excellent mother, as she requested, and take her infant child, of such tender years, with her, and spend a few months with her in peace and quiet under the treatment of her confidential physician, and see whether all impediments to the conjugal happiness which thejr had previously enjoyed, would not be removed, which I think, in the light of this record, would most probably have been the result if he had been a man to have pursued that course, and had treated Ms wife with that tenderness and consideration she was entitled to ? But if such had not been the result, and time had shown that there was an immovable impedi *373 ment to a reunion as man and wife, as indicated by tbe allegation, then it would have been better, and more noble, and more just for him to have given her up, and the child too—better for him and far better for the child—than to have tortured her maternal feelings as he has done, and to have exhibited towards her the coldness and indifference he has, and the ill feeling and bitterness he has, and to have come into court with such a complaint against his wife.
.But what real ground has he for complaint against his ■wife on this score ?
There is no doubt that during her visit to Kentucky in 1875 she was and had been suffering from diseases for which she was not responsible or in any manner culpable, which should have shielded her from the censure, complaint and resentment of her husband. I will only refer to the deposition of Dr. J. J. Dulaney, her distinguished and confidential physician and relative, who conclusively establishes this fact (p. 247 of the record). After describing her situation, he says he “procured for her a mechanical support, and prescribed remedies suited to her diseased condition.” It now seems that in following the prescribed remedies of her physician she incurred the complaint and cenhure of her husband and his bitter and cruel resentment.
“At Lynchburg, Va., in January, 1877,” Dr. Dulaney says, “I last saw her, and she was at that time still feeble and debilitated; she was not suffering as much from local disease as she was in 1875, and I think she would have appeared better at that time if it had not been for the mental distress occasioned by the suit then pending between her husband and herself for divorce.” He must have referred to the suit brought b'y her husband against her, as this suit had not then been commenced.
Dr. "W. O. Owen, an eminent physician of Lynchburg, and relation of defendant, and his witness, concurs in *374 opinion with Dr. Dulaney as to the effect of such diseases, and I think, also, as to the remedy.
The doctor had said upon his direct examination: “ I told her (Mrs. Latham) that she must consent to act as other married women did, and allow her husband the privileges that other husbands had. She replied that her conscience would not allow her to do it, without saying why. Her exact language was, ‘You .surely can’t ask me to do a thing which is against my conscience ? ’ And. now plaintiff’s counsel asked him, when Mrs. Latham used this expression, might she not have referred to what she regarded as her duty in respect to her physical health? To which the doctor answered, “I suppose it is susceptible of that construction, but I did not so understand it.” She had not been under Dr. Owen’s treatment, and he could express no opinion as to her diseased condition; but he did say that he noticed a change for the worse in her physical condition. But the testimony of Dr. Dulaney is conclusive on this point, and her disease existed during the whole period embraced by the defendant’s allegation, and doubtless had much influence in producing the trouble. But it appears from her reply to Dr. Owen that her refusal to take his advice was not put on*, that ground, but was made a point of conscience. And yet she could not have meant that she had moral or religious scruples on the subject of cohabitation between husband and wife; the fruit of her marriage is a standing and conclusive fact against such a conclusion. It is impossible to believe that a woman whose principles were so decided and matured on moral subjects could be brought suddenly to regard that as sinful which the Bible sanctioned, and which the Christian ■world has ever practiced, and without which the human race would become extinct. Her well balanced mind and Christian principles could never have allowed her to embrace any such false and morbid notions of religious *375 oi’ moral duty; and especially must we so conclude when her difficulties in conscience can be accounted for on high and honorable principles.
About the middle of December, 1876, the defendant had a bill of divorce prepared, and presented it to the judge, and obtained an injunction to restrain her from removing her child. I am of opinion that the hustings court erred in overruling the motion of plaintiff to require defendant to produce that paper and file it in the cause. It tvas an important act in this painful drama, and would have been evidence of the animus with which the defendant persecuted the plaintiff, and would have had an important bearing upon the merits of this controversy. But the plaintiff' knew that the defendant was seeking a divorce from her. She was informed by his counsel that they were instructed by him to obtain a divorce, and that the papers had all been prepared for the purpose; and whilst they do not inform her what were the allegations of the bill, they say that they were sufficient to entitle him to a divorce. It was after this procedure by the defendant, that the conversation detailed by Dr. Owen occurred. She had then, after a long course of maltreatment, disclosed by the evidence, been cast off' by her husband, and' was not recognized by him as his wife. Could she have consented to be the expectant mother of other children by him, to have them torn from her in tender infancy, as he had torn from her the child she had borne him, to be deprived of a mother’s care and training ? Could she consent to be the mother of his children, when they were to be taken from her as soon as they were old enough to receive instruction, and she would not be allowed the office of a mother in inculcating in their tender minds the duties which they owe to God and man ? Could she have consorted with him as his wife, whilst he held a bill of divorce over her, indicting charges against her, it may be, as. infamous as those *376 he made against her in his answer to her bill, which he might file in court any day, and which she was instructed his counsel was only held up to see if they could not get for him a permanent separation by private agreement? gpe cou]<p not -then regard him as her husband, and spe might well have considered that to yield to him would be to take the place of his legalized mistress, and not of a wife. To have given him the privileges of a husband under such conditions would have been to yield her body to him for prostitution. ETo honorable, conscientious, virtuous and high-principled woman could ever submit to occupy such a position. This view of the case, I think, satisfactorily explains her reply to Dr. Owen, and is a complete justification of her course.
“The doctor mentions also a remark she made to him long anterior to his having any knowledge of a disagreement between her and her husband. “Although,” he says, “her air was serious, I did not think the expression was one of any importance.” That is the best interpretation of the character of her remark.
Old Airs. Latham is also introduced by her son to testify that she declared to her just before the birth other first child that .she would never have another. From the strength of her expressions on that occasion, as detailed by the old lady, which probably have lost nothing clothed in her language, she must have felt deeply. It was the language of passionate grief and suffering. I do not know that it is unnatural that a lady of great refinement and delicacy of feeling and innate modesty, and under great suffering, should have the feelings this lady expressed to her mother-in-law just before her accouchment with her first child. I have heard of a gentleman saying that his - wife had had twelve children, and he was under the impression that she never failed to declare before the birth of each one that she never would have another.
*377 That no inference can be drawn from the passionate declarations made to old Mrs. Latham, that the plaintiff had any fixed false notions on this subject, or any that such indulgence was immoral and in-eligious, is evident from the fact that after those declarations were made, and after her accouchment, she and her husband lived a happy married life together at Danville, which the proof clearly establishes, and with regard to which there seems to be a concurrence of opinion between my brethren and myself; and in fact it is admitted by the allegation itself that even after they left Danville for short intervals the defendant was not excluded from the privileges of a husband. There is no complaint of this nature which extends back of the period of her becoming diseased, except that she would not allow the consummation of the marriage until several weeks after its solemnization—until after their arrival in Maryland, which is indelicately exposed in his answer. If it is trúe, it only shows that his wife was not sensual, and it is not inconsistent with the modesty and refinement attributed to her by her friends. But that she yielded we must conclude, from the fact of the birth of their child in less than eleven months after their marriage.
After her visit to Kentucky, and probably before they left there, under the advice of her physician, their intercourse was more restricted, and then the ill temper and dissatisfaction of her husband began to show itself. From these facts I think it may be fairly inferred, first, that the strong and passionate expressions made to her mother-in-law just before the birth of her child, as detailed in her deposition, were the result of her suffering and distress at the time, and cannot be construed as indicating any fixed moi’bid religious scruples on the subject of cohabitation between husband and wife; and, secondly, a confirmation of the opinion before expressed, *378 that the ill temper of the husband and his ill treatment of his wife has been' primarily and mainly caused, not the influence which questions of property have had, by her restricting him in his otherwise lawful gratifica¿jon. there is a strong presumption from the discourteous and inhospitable treatment which his wife’s mother and sister and other friends received from members of his family, and from other circumstances disclosed by the record, that in his mal-treatment of his wife he acted not without prompting and encouragement from them.
As to defendant’s social position, I know nothing more than the record shows; but I should suppose that in Virginia society, or well-regulated society anywhere, a man could hardly occupy a high social position who would treat the mother or sister of his wife, or other ladies of refinement visiting at his house, with rudeness and insult, or who would deny the mother and sister of his wife, or his son’s wife, by ad insulting letter, the privilege of visiting her at his house. Any one wishing to know more of this can read the depositions of Mrs. Tyree, Mrs. Ford, Mrs. Manson and Miss Lou. Graves, and the note of ~VV. Latham, Sr., to Mrs. A. C.’ Graves, which was introduced in evidence by the defendant, remembering that the imputations he makes against Mrs. Graves and her daughter are not supported by a particle of testimony, and in the absence of such testimony, by the known character of those ladies they are repelled, and must be taken as an intentional insult.
This conduct towards the mother and sister and the lady friends of the plaintiff was with the concurrence of the defendant. . They would hardly have been so treated if it was displeasing to him; in fact, in much of it he ■ was himself an actor. I am not oblivious to the fact that several respectable witnesses of Culpeper have testified most favorably to the impressions he made on them *379 in his boyhood and early youth, and of the tenns of eulogy in which they speak of him, and I wish there was nothing in this record to mar and deface that picture. I have felt it 3ny duty in the course of this opinion to exhibit the facts. I forbear further comment.
I think the inference is plain, from all that has been said, that the defendant in arraigning his wife upon all the various chai’ges which we have been patiently and laboiiously investigating, has shown that he is uttei’ly estranged and alienated from her; that he has no regard or love for her as his wife, but that he hates hei’, and would ruin her if he could; and that in the publication of her sti’ictly confidential letters, written to him in relations of confidence of the most delicate and most sacred character, and the private confidential letters written by her to his mother with perfect freedom from restraint, in the confidence that she was writing to one who would not abuse her confidence and use it to her prejudice; and in the betrayal of the confidence reposed -in him by his wife’s mother, by publication of letters which she addressed to him expressly under the seal of condfidence, there is no justification for defendant. He can find neither justification nor apology on the ground that his wife had unjustly charged him with the crime of adultery, and employed detectives to hunt up evidence to establish the chai’ge. There is no evidence that she employéd detectives. It was not impi’oper for her or her friends to employ any lawful means to discover testimony to support the charge. There is no evidence that they employed unfair means. But the charge had not been made when the defendant’s answer was filed, nor when he broke the seal of confidence in publishing the letters. It was not made in her oiiginal bill. • She had then not a thought or suspicion that her husband had ever been guilty of such unfaithfulness to his marriage vow, as she avers in her amended bill. And it appears *380 from the testimony of Eliza Patterson that she did not communicate it to the plaintiff until after she went to with Mrs. Dawson, when the plaintiff remarked that she had never thought of such a thing; and she says she wenj. £0 pve jy[rs_ Dawson on the 7th of March, which is the day the defendant’s answer was filed. The charge was made in the amended bill which was filed the" 4th of July, 1877, and not before. And no testimony wras given tending to implicate him until the 4th of June, 1877—long after the defendant had made his unfounded charges against his wife in his answer, and long after the publication of the aforesaid letters. It was nearly three months after his answer was filed before the depositions were given which implicated him in the offence, and nearly four months before the charge was made by the plaintiff’s amended bill. And I think her counsel would have been derelict in duty if they had not advised it after what had been disclosed by the testimony of Eliza Patterson and Maurice Dawson.
A most unwarrantable attempt was made by introducing testimony of alleged declarations made by the witness, Eliza Patterson, to the mother, brothers and sisters of the defendant, of base and profligate attempts made by the plaintiff to influence and suborn the witness in her testimony, under the specious pretext of invalid ating the witness. B u t all such testimony was mere hearsay, and was not entitled to the weight of a feather against the plaintiff. And the most of it was inadmissible for the purpose of invalidation, and the court below erred in not sustaining the exceptions taken to it by the plaintiff’s counsel, and in not excluding it from the record.
This brings us to the consideration of the issue made by the amended bill. I think the testimony of Eliza Patterson and Maurice Dawson, if believed and unexplained, were sufficient to sustain the charge of adultery in a bill *381 for a divorce. The. credibility of the former is fiercely assailed. She is a colored girl, and at the time of the alleged overtures and solicitations of the defendant she was a servant in his employment, but at the time her deposition was given was not in the employment of either of the parties to this suit. I think the testimony of a witness in her position ought to be received by the courts with great caution, because, in their ignorance and weakness, they are liable to be influenced improperly. The court should look to the capacity of the witness, the intrinsic character of the testimony, its reasonableness and consistency with itself and the established facts of the case, and the influences -which may have been actually exerted, of which would likely have operated on the witness.
In this case the witness does not appear to be deficient in capacity, and her testimony is not unreasonable or inconsistent with itself or the established facts of the record. Old Mrs. Latham, years before, seemed to have apprehended danger, and* says she warned the plaintiff against it. And about the time the witness testifies these overtures were made, with the solicitude of a mother,she felt uneasiness. She knew that her son and his wife were occupying different chambers, he having given up his place in his wife’s chamber to her sister, and this mulatto girl was attending to his chamber, and she may have noticed something specially which excited her fears, and she takes the girl to task, and charges her with pregnancy wThen there could have been nothing visible to indicate it, as she was not. The reason she assigns— that if it were so, she did not wish the girl to be a burden on her hands—would seem to be insufficient. It would be time enough, if she were in that condition, to relieve herself of the burden after it became manifest. She most probably wished to find out the character of the girl and to ascertain whether her son was not in *382 danger. And afterwards, when her son deserted his wife’s chamber, she had a bed for him in her chamber, of the one he had occupied before alone. And when, after the plaintiff had been informed that the defendant had caused a bill to be prepared for a divorce, wpich be had presented to the judge, who had granted him an injunction, which was only held in abeyance pending negotiations for a permanent separation by agreement, in preparing for her defence in said suit, a sister of defendant ascertained from Eliza Patterson that she was sent by the plaintiff to her counsel, Mr. Williams, to make a statement of what she knew and could testify in said suit in her behalf, it was soon made known to tlie family of the defendant, his mother, two of his brothers, Woodville and Charles, and his sisters, and it seems to have caused quite a sensation and stir amongst them; their sympathies were very much excited for the girl, who they represent to have been in great distress, and in the kindness of their hearts they catechised the plaintiff’s witness as to what she knew, and advised her as to how she might relieve herself .from the difficulty; for it seems she did not wish to be a witness. Wood-ville says he had two interviews with her; the first some days before she went to see Mr. Williams. This was of his seeking. He says that he was at his father’s house in the evening, when some member of the family remarked that Eliza Patterson was in great distress on account of an interview she had had with Mrs. Latham in regard to her giving testimony for her, and he sent for her to come in the parlor. And the next interview he had with her was some days after she had been to see Mr. Williams. His brother Charles had come down from Danville, and he, and one of his sisters also, had an interview with her before she went to see Mr. Williams, and he one after. The witness and Charles Latham differ as to what they advised her. She testifies that they told her to tell Mr. *383 "Williams that what she had to say would not do Miss Fannie any good, and that it wouldn’t be worth while in him questioning her. Whether she, or he, is mistaken as to the advice given her, she seems so to have understood it, for that is the course she pursued; for she says: “After I told him that, he did not ask me but two questions, that I can remember.” I infer from the solicitude and anxiety manifested by the mother, brothers and sisters of the defendant, that they must have apprehended that she would testify to something that would be very damaging to the defendant. They probably had some intimation before that of her having said that solicitations had been made to her by the defendant, for in answer to the twenty-second question of the cross-examination, she says the first morning he said anything to her she went straight down into the kitchen and told the cook, “ Aunt Lizzie Adams;” and the second time he said anything to her she told her again, and told no one else but her at that time. About a month or two afterwards they got another cook, and she says she was talking with her about it in the kitchen, and the little boy was up stairs over the kitchen and heal’d her; who, she says, always said he would tell it.
If these statements were not true, it was in the power of the defendant to have shown.it by introducing the persons named by the witness to contradict her. It was not competent for the plaintiff to introduce them to support the witness, and the presumption is, that the defendant did not, because they would, if introduced, have sustained the witness. But the plaintiff had then never heard of it; she did not communicate it to her until after she had left the Lathams’ house and was boarding at Mrs. Jordan’s, and of course was seeking her testimony for no such purpose, but only to prove the treatment she had received from her husband in presence of the witness.
*384 But the weeping and great distress of the witness, as represented by them! Why should it have caused her so much distress to give a statement to the plaintiff’s counsel of all that the plaintiff' was aware at that time that she knew, and which is contained in hér deposition ? It must have been caused by the dread of displeasing the defendant, in whose employment she was, and his family, that caused her such great distress, and the idea that if she gave testimony at all that she would have to expose the conduct of the defendant, of which at that time the plaintiff had not been informed, and of which she had not even a suspicion. It was very natural that it would be repulsive to her to make a public exposure of those matters, and more especially if she had reason to believe it would make a breach between her and Mr. Latham and his mother and sisters and brothers, as it would most likely do. It seems to me that it is only in this way that the distress which she manifested, as is represented, can be accounted for. It could not be from a dread of displeasing the plaintiff if she did not testify to it; for she was aware that the plaintiff was then wholly ignorant that such interviews had occurred between her and her husband, and consequently if she had suppressed it in her testimony it could have given her no displeasure, for she was not expecting her to give such testimony. In answer to the defendant’s forty-first question, she says': “ She (Mrs. Latham) only told me to go and see Mr. Williams, and I hesitated to go, but she talked with me a while, and I consented to go. She said, she thought it was very unkind in me not to go; that is all I remember.” She testifies that she did not tell Mrs: Latham until after she left her and went to live at Mrs. Dawson’s. She told her in her room at Mrs. Jordan’s. This was long after the plaintiff had left the house of her husband’s father, and after she had requested the witness to go to Mr. Williams, and in fact after the *385 defendant had filed his answer to her bill. And she testifies in answer to'defendant’s twenty-eighth question that, she told the plaintiff without her asking her thing about it—“she told her of her own accord,” and the plaintiff'remarked “she never had thought of such a thing.” I am perfectly satisfied from the evidence that no improper influence was exerted by the plaintiff to induce her to give the testimony she gave, or to give any testimony, and that her testimony was given against strong influences that were brought to bear upon her from the other side. I think that the testimony of the defendant’s witnesses as to declarations made by the witness to them, as to the influence the plaintiff' exerted over her to induce her to testify, is no evidence against the plaintiff', being mere hearsay, and is incredible in itself, and is contradicted by the witness when on oath, and that it was, at least nearly all of it, inadmissible even for the purpose of invalidating the witness, no proper foundation having been laid for its introduction; and that if it were admissible it would not show, under the circumstances, that the witness had not told the truth when she testified on oath. I am of opinion that her testimony is not inconsistent with other facts in the record, that it is consistent with itself, and seems to have been given without prejudice or partiality, and I do not feel at liberty to disregard it.
Ho attempt has been made to' discredit Maurice Dawson, but the plaintiff has introduced a witness, J. H. Ballard, then a United States officer, by whom he proves they went together to the house of ill-fame innocently, and from no improper purpose, mistaking it for a respectable boarding house, and left it as soon as they discovered their mistake. He says he and the defendant went to this house “just before night” on a Sunday evening, “ only a short while; don’t remember whether the suú was down *386 or not; it was not getting dark though.” Dawson says ^ was on Sunday night between seven (then after dark) eleven o’clock when he saw defendant with his friend, who was, a stranger to him, at that house. He thinks it was nearer seven than eleven. He was, after he gave his deposition, introduced to Mr. Ballard, and afterwards testified that he did not think he was the man he saw with defendant, but was not certain, because he couldn’t see the gentleman plainly that night, had never seen him before, and did not notice him as particularly as he did the defendant. Assuming that it was, when J. H. Ballard was with him that the witness Dawson saw the defendant at the house of ill-fame, no presumption of guilt from the fact of his being seen at that house can be raised against the defendant if Ballard is credited, and so much doubt is thrown upon the other testimony offered in support of the charge by the defendant’s testimony that I think the evidence, taken altogether in support of it, is insufficient in law to establish the charge.. Having disposed of these matters, and endeavored to clear the case of what has been improperly thrown into it to prejudice the plaintiff, we are prepared to consider the grounds upon which she seeks a divorce from bed and board and the custody and nurture of her infant child by her original bill. They are the statutory grounds of cruelty, a reasonable apprehension of bodily hurt or abandonment or desertion. The evidence is entirely satisfactory to my mind that the plaintiff is entitled to a divorce upon each and all of them.
I thinkthe evidence shows that she has been treated with cruelty—yea, the refinement of cruelty. Her husband seems to have taken a mistaken view of the marital -rights of himself and wife, and has failed to appreciate the conduct of his wife in its true light; and this has led him to a course of conduct towards her that is cruel and inhuman.
*387 It is true that it is the husband’s God-given prerogative to be the head of his family, and to be the ultimate authority in his domestic circle, and a good wife will spect his authority when exercised within proper hounds; but a woman when she marries does not surrender all her rights. It is an old common law doctrine, that her legal rights are merged in her husband; but courts of equity and modern legislation have greatly modified the old common law doctrine and enlarged the legal rights and equities of the wife. The wife does not lose her individuality, morally or socially. She retains her moral and human rights—her moral and religions responsibilities—her natural and moral sensibilities—her liberty of thought and freedom of speech. She is not the slave of her husband (though she is too often made such); she is morally and socially his equal. She has her rights and privileges within her sphere, which the husband cannot ■withhold from her except by an act of oppression. And the care and nurture and training of her children in the nursery is within her sphere, and properly belong to her peculiar province. The husband should give such assistance as he can to his wife in raising their children, and especially in supporting her authority. Hut surely it is not his duty or his privilege to go into the nursery and take charge of them and supersede their mother in her position of authority there. The children, and especially such as are of the tender years of this plaintiff’s child, need the constant care and watchful superintendence of' the mother. This cannot be rendered by the father, who has out-door duties to perform, and hence must devolve on the mother. And there are duties which must he performed by the tender female hand; and if not performed by the mother, must he by some other female. I deny the right of the father to take the child from the mother against her consent, and to place it under the care of another woman in opposition to her wishes.
*388 The training and instruction of the children in early life, and during the period when their characters are being formed, properly devolves on the mother. The responsibility rests on her more than on the father, for tile reason that she can be always with them, whilst the father, who has his out-door duties, cannot; and the mother is usually better qualified to train and instruct her children. The maternal influence is proverbial. Ho-man, perhaps, ever excelled in life who could not ascribe the qualities he possessed which gave him success to maternal influence. I say, then, this is the peculiar province of the mother; it is the positiou wherein God placed her, and she is responsible to Him for the manner in which she discharges the duty. Aud the husband who interferes with her, takes her child from her, and prohibits-her from having the care and training of it, if she is capable, prevents her from meeting the responsibilities ■which she is under to her Maker, inflicts upon her unmitigated cruelty, and incurs guilt in the sight of Heaven. Such acts are an abuse of his authority and a flagrant violation of his marital obligations.
Hut the wife is entitled to have her child with her for her happiness, solace and comfort. It is generally believed,, I think, that the affections of a mother are stronger than those of a father; and I believe it. What affection is-stronger than a mother’s love ? Whilst a father may exercise an advisory influence with the mother in the management, control and training of her children, I deny emphatically his right to take away the care and custody of the child from the mother, as' in this case, and give it to Ms mother or sisters, or anybody, against her consent and wishes. It is an enormous wrong and cruel outrage upon the rights of the mother. Even brute beasts are allowed in general to have their young offspring with them. It is painful to separate the tender offspring of a brute beast from its mother.
*389 The moral sentiment of the woi’ld looked with abhorrence on the separation of a female slave who was a mother from her offspring of tender years. It was not ■often done when slavery was sanctioned by law, though the master had the,power; and when it was done, the mind of every man and woman of moral- sensibility in the community where it occurred revolted and condemned it. But to tear from ■ the bosom of a young, ardent, refined, highly cultivated, amiable, devoted mother, eminently qualified, morally and mentally, for rearing it, in defiance of her cries and entreaties, the infant child that she has borne, and to consign it to the rearing and training of the mother or sisters of the father, or any other person, is a barbarity and refinement of cruelty which no man has a right to inflict on his wife. I care not what precedents may be hunted up to support it—and none, I believe, can be found—I hold that it is opposed to all righteous law, human and divine; and I will never sanction it. It is cruelty when inflicted, which entitles a wife to be released from her obligations to her husband and to the protection of the law in her custody of her child.
That these cruelties, besides various other methods of showing his ill-will to her, have been inflicted by the defendant upon his wife, beyond all question or controversy, and I think, under circumstances of great aggravation, is abundantly shown by the testimony in this record. I regret that the limits of this opinion will not allow the recital of it. I must content myself with a reference to the depositions of Miss Lou. A. Graves, Charles A. Graves, Dr. Dulaney, Eliza Patterson, Mrs. Eord, Mrs. Tyree and Mrs. Boyd. He first takes her child from her most of the day and places it in charge of his mother and sisters, or takes it to his brother 'Woodville’s, but usually returns it to her in the evening, though sometimes she is not allowed to see it until the next morning. He pro *390 Mbits her from taking it with her in her walks for recreation, or in making calls on her friends. Soon privileges are further restricted, and the child is taken from her also for the night, and she is denied the prjyQege 0f f0Ming him in her arms to sleep. Finally, her cMld, the pride and joy of her heart, is torn from her embraces and her sight, clandestinely and secretly, and.carried to Danville, under circumstances indicating that the separation was designed to be final; and thus abandoned by her husband and bereft of her child, she is at last driven, as her last hope, to appeal to the laws of her country for protection. If the statute is to be construed as using the term, cruelty, in a sense different from its use in common parlance, and implies injui’y to the body only (which includes the life or health), I agree with Bishop, that the more rational application of the doctrine of cruelty is to consider a course of marital unkindness with reference' to the effect it must necessarily produce on the life or health of the wife; and if it has been such as to injure either, to regard it as true legal cruelty. To hold absolutely that if a husband avoids positive or threatened personal violence, the wife has no protection against any means short of these, to which he may resort, and which may destroy her life or health, is to invite such an infliction by the indemity to the wrong-doer. 1 Bish. M. & D. edition, § 732. Again : “Suppose the body is the only thing to be considered in these cases, yet if we find various avenues to it, through any one of which may run the waters to drown its life or health, surely we cannot say that the approaches through one avenue should be left open by the law, while the others are closed.” Ib. § 733. This I hold to be sound doctrine, and it applies to the case in hand, for such cruelties as this record exhibits, must prey upon the sensitive and refined nature of the plaintiff’, and undermine and destroy her health and imperil her life. *391 And it has been shown that her health has already been injured, by the testimony of Dr. Owen, defendant’s own witness, Dr. Dulaney, and especially Mrs. Owen. The. ground of divorce for cruelty, I think, is fully established.
I am also of opinion that the plaintiff has “reasonable apprehension of bodily hurt.” She says in her bill, so bitter and relentless is the treatment she has received, that she does not feel safe in the house, and is afraid to remain there. She has continued to remain there for the child’s sake and the fear she had of impairing her claim to him if she withdrew without the defendant’s consent. He did presume to lay violent hands upon her, and bruised her hands and arms. The bruises could be seen four days afterwards, as proved by Mrs. Boyd. On another occasion he admits that he threatened to punish her, thereby asserting a right to punish her. The husband has no right to punish his wife. Ho language with which a wife might reproach her husband could justify him in inflicting punishment on her. He acknowledges without shame or apology, in his address to the court, that he did threaten to punish her, as if it were his right to do so, which he evidently claims. Before God he promised “to love and cherish her, to honor and keep her in sickness and in health, as long as they both lived; ” and yet he dares now threaten to punisli her.
From this threat, acknowledged before the court in a way implying a claim of right to punish his wife, in connection with the fact of his once laying violent hands upon her, and with the temper and spirit he manifested towards her by his studied indifference, neglect, harshness, bitterness and cruelty which the evidence unfolds, I am forced to the conclusion that she had cause for her sense of insecurity, “ and reasonable apprehension of bodily hurt,” if she remained with him.
But he abandoned her. In Bailey v. Bailey, 21 Gratt. *392 43, we held that “desertion is a breach of matrimonial duty, and is composed, first, of the actual breaking off the matrimonial cohabitation; and, secón dlyT, an intent to desert in the mind of the offender. Both must com-make tpe desertion complete.” In this case it js proved that there was an actual breaking off’ of the matrimonial cohabitation. It is proved that some time before he went off’ to Danville and carried her child with him, he had not only deserted his wife’s chamber and slept in another room, but took the child from its mother and carried it into his mother’s room to sleep with him. Here was a breaking oft’ of matrimonial cohabitation.
The defendant, it is true, alleges that ho deserted his wife’s room because she demanded it; but, as we have seen, there is no proof to sustain the allegation, or that it was at her request, or with her consent. The fact of the breaking off the matrimonial cohabitation is established; was it done'by the husband with intent to abandon her ? I think the fact that he wanted a perpetual separation, and had employed counsel to procure it, and had a bill and the papers necessary to procure a divorce prepared, and had declared to her brother that there never could be a reconciliation between them, and that they never could live together again as man and wife, and a few days afterwards, without any notice to his wife, moving off to Danville, and clandestinely, as shown by the deposition of Bichard Jackson, the haekman, carrying her child of such a tender age with him, selling the chamber furniture used by his wife, including the bed upon which she slept, and dismissing her maid-servant, and causing his other effects, in two trunks heavily packed, to be sent after him the next day, is as conclusive as evidence could well be of his intent to abandon her; and that the note he left, to be handed to her after he was gone, and which was not delivered to her until the night after he left, and when he was in Danville,, and *393 delivered by a stranger who refused to give his name, does not alter this conclusion.
That note is dated Lynchburg, Virginia, February 21, 1877, and is in these words: “Dr. Fannie—The condition of my business makes it necessary for me to go to Danville to-day. For obvious reasons I take Boy with me. I will go to my brother’s house; you may follow7 us to-morrow.” This w'as the first intimation she had.of his purpose to go to Danville, as the note itself implies. He ■was going that day, and would take her baby -with him, but four days over tw7o and a half years old. His business requires him to go there. Ho intimation when, or that he ever will return to Lynchburg. He had discontinued his residence at his father’s, in the way he had been residing there, by selling out his chamber furniture to his mother, without consulting his wife, and dismissing her servant maid, and does not inform her that he had made any other agreement with his father or mother to return and resume his residence there upon a new arrangement, nor is there any evidence that he had; nor does he inform her that he had made any agreement with either of them to continue her board there, nor is there any evidence that he had; or that after breaking up the former arrangement, he had made any new provision for her to remain there; or that he had provided any place as a home for her in Lynchburg. He tells her I am going to my brother’s. The same brother who had come from Danville to Lynchburg and held a parly with her witness, to advise her what to do; and such a parly as this record show's! He says I am going there— I have a place provided for myself—you may follow. Hut does not request her to do so; does not say I have provided a place there for you too, or my brother invites you to come—but you may follow' to-morrow, and can look out for yourself; I have provided no. place for you. *394 He knew when he penned that note that his wife could not follow him; that it was morally impossible that she under the circumstances. And he didn’t want her to follow him. If he had, he would have told her before ^ 2ept ^ha^ Pq was going to Danville, and would pave requested her to go with him. He had deserted her chamber and taken her child from her before be left his father’s, and declared that there never could be a reconciliation between them, and that they never could live together again as man and wife; and had employed counsel to procure a divorce for him, or a permanent separation, and it is evident he did not wish her to follow him to Danville, and he had made no provision for her there, and had provided no home for her where she was. And so he left his wife, whom he was bound by the most sacred obligations to provide for and protect, a deserted waif upon the sea of life. There she stood alone, without a home, bereft of her darling child, deserted by her husband, surrounded by his friends—her enemies. It is, in my opinion, clearly a case of desertion and abandonment—of cruel desertion; and the note which was delivered to her the night after he left, was an aggravation of its cruelty. This case is much stronger than that put by Bishop, when he says: “If the husband causes to be prepared the necessary papers for a divorce, and so informs his wife, his departure in a secret and clandestine manner establishes at once a desertion.” 1 Bishop, 5th edition, § 783.
In case of a decree of divorce the court is invested with plenary power by section 12 of the statute, to determine with which of the parents the child should remain. The statute makes no provision for its care and custody in a case where there is no decree of divorce. The statute does not in that case vest the court with authority,' nor does it take it away. It is silent on that subject, and *395 therefore, I maintain, leaves the court to its general jurisdiction.
But I am so firmly couvinced that the plaintiff here entitled to a divorce from bed and board that I will not stop to debate that question now, especially as this opinion has unavoidably been extended to an unusual length.
It cannot be questioned that this lady has been subjected to cruel treatment (at least as that word is understood in common parlance), humiliation and oppression. I think I have shown by a review of the testimony that the main cause of it -was no fault of hers, but her misfortune. She rests now under the frown and bitter reproaches of her husband and all his family. He has made no overtures to her for reconciliation or of affection, as the husband did in the case of Kerr v. Kerr. He gives no indication of relenting, or assurance that if she returned to him she would be treated as a wife should be, as was given by the husband in that case, but exhibits unabated indifference toward her, alienation, and positive hatred. She has been abandoned by him, and left to drift on the stormy ocean of life without a home, and bereft of her child, who has been ruthlessly torn from her bosom. If her bill should be dismissed it would be to say to her: The courts can give you no relief; you belong to your husband; you must submit to his exactions, however cruel and injurious to your health. You have no civil rights; you are his slave, and, he willing it, you must be subordinate in rank and station to his mother and sisters. Or you must surrender the child you have borne, though you feel it is a part of yourself; though you brought it into life and being in anguish and travail, and nurtured it from your own breasts, and nursed it in sickness and in health, through day and through sleepless nights, and have raised it to its present stature and taught its little feet to walk and its tongue to *396 prattle—your sweetest music:—though God has thrown on you the responsibility of training it, not only for this life, but for a better life to come. That duty must be discharged by others who do not love it as you do, and cannot discharge the duty as a mother can.
Such is the cruel alternative that would be presented to this “amiable, well-principled and high-bred lady” by a dismissal of her bill. What will be her decision I will not conjecture. I have ever been in favor of maintaining the marital relation on just principles, and have been opposed to granting divorces upon slight grounds; but in this case, if the plaintiff should be influenced by a mother’s love to sacrifice herself, I do not think she should be subjected to such a sacrifice. Better that they should never be reunited. A reunion thus coerced, I cannot see that it could ever result in a .happy reconciliation and a happy married life. In this case the husband was the first to move for a divorce, and his conduct towards her has been such as was evidently calculated and designed to drive her from him, with the feeling, as he declared, that there could be no reconciliation, and that they never could live together again as man and wife. And under these circumstances, should she be constrained by torturing her maternal feelings to throw herself at his feet and implore his mercy to be treated by him as he lists, and to be subordinated to his coterie of friends and relatives? If it is done, I can have no hand in -it. I cannot sanction it.
But if this court could recognize her strong claims to its interposition for her'protection and legalize a separation from her husband, who claims the right to punish her, and has threatened her, and has abandoned her, and allow her to have the society of her child, at least for a time, during its pupilage-, when it needs á mother’s watchful care and training; and she could return to her widowed mother and friends in her native state and *397 enjoy a little peace and quiet and the treatment of her physician, feeling once more freed from the shackles which have oppressed and crushed her, there would be a good prospect for the restoration of her health; and her husband, seeing that she was nd longer in his power, might relent and repent of his ill-advised course towards his wife, and be prepared to sue for reconciliation; it is not impossible, if he has not utterly forfeited her respect and confidence, and a reunion could ever be desirable, that it might be successful upon terms that -would secure to her the rank and position which a wife and mother is entitled to in the family; and on no other terms ought they ever to be reunited.
But if such should not be the result, it would be far better for the child. The evidence in the cause abundantly shows that the mother is eminently qualified, morally and mentally, to have the custody and training and education of her child, and no one can fill the place of a mother; and the child would be constantly under her care and supervision. But the father, circumstanced as he is, is not a fit person to have the cafe and training of this child. I think it was Lord Brougham’s opinion that the character of the man is formed before the child attains the age of seven years. The defendant holds a public office, which requires him to be absent from home niuch of his .time, and often attending the courts. If he carried his child with him he could not be under his supervision. Until he is several years older, he would have to take his nurse with him, or employ one where he took him. And when he is old enough to dispense with a nurse he could not be with his father and under his superintendence, and would have to be let run at large if he took him with him, which would soon be his ruin.
But if his father does not take him with him he could not be in his custody; he would have to place him in the *398 care and custody of some woman. I conclude, there-f°re> that the father is not a fit person to have the cusof the child; in fact, it would be impossible that he could personally take the custody of him. He would have to place him irt the costody of some woman; and p unqualifiedly assert that there is no woman on this earth who is as well qualified to have the rearing and custody of that child as his own mother. It is reduced then to a question, not between the child’s father and his mother which should have his custody, hut whether his mother or some other woman should have the custody of him. If it were a question between the -mother and the father, it is palpable that it would be for the good of the child that the mother should have him. And all the authorities hold that the good of the child is the turning point. I do not understand that there could be any question as to the right of its custody between its own mother and the mother or sisters of its father, or any other woman. I must say that there is a conviction of my mind that if this dear child should be placed in the custody of his mother, and God spares' his life, he will be raised up to be a useful and respectable member of society; but if taken from her, and placed in the custody of his father, there Is a fearful probability that his ruin will be the consequence.
I am of opinion, therefore, to reverse ,t.he decree of the hustings court, to decree a divorce a mensa et tlioro in favor of the plaintiff, to settle her entire estate which she derived from her father upon her, and to give to her the custody of her child, and to remand the cause for an account, to ascertain what sum would be a proper charge against the defendant, considering his circumstances, as alimony to his wife, and for the support and maintenance of the child. I therefore dissent from the opinion of the court, but am not opposed to the provision in the decree, as the bill of the plaintiff is dismissed, that the *399 dismissal shall he without prejudice to any right she may have to institute a suit in her own behalf, or on behalf of the child, for its custody.
Moncure, P., and Christian and Burks, J’s, concurred in the opinion of Staples, J.
Decree affirmed.

 Note by the Judge.—It is admitted in the opinion of the majority of the court that he sold the furniture of his wife’s chamber to his mother, but it is suggested that he sold it after he went to Danville. If that is so he must have sold it on the 22d of February. On the 21st he went to Danville. On that day he dismissed his wife’s servant-maid. The next day, the 22d, his trunks were sent after him. The next day, the 23d, Charles A. Graves was informed by the defendant's mother that he had sold the furniture to her. He testifies that on the 23d he went to the house of W. Latham, Senior, to remove the plaintiff’s personal effects, and he says: “I met Mrs. W. Latham at the door, to whom I stated my errand. She. said Fannie had only a few things—her trunks, sewing-machine, a small stand, with perhaps some few other things; that everything else in the room Robert 'had sold to her, and that she had paid him the money for them. (Italics mine.) I mentioned a work-table (and) pair of chromos, which Robert had presented to Fannie. She stated that she had bought those things of Robert, and that I must not take them.”
I understood from the foregoing that the sale was made by the defendant to his mother before he left for Danville, and that, I think, is the fair infer *344 ence. Besides, there was not time for the negotiation and sale and payment •of the money between the 21st and the 23d of February—one party being in Danville and the other in Lynchburg. There was no correspondence between them in that brief interval of time, so far as appears. If there had been the letters could have been produced. That was not pretended in the argument. But if it was after the defendant got to Danville it does not help him; it only shows a more deliberate intention to break up and abandon his home in Lynchburg. It can’t be said that it was because his wife was seeking a divorce from him. She did not sue out her spa in chancery until the day after this claim was made to the furnit are by old Mrs. Latham by purchase from the defendant, to-wit: on the 24th day of February, 1877 ; and her bill was not filed until Ihe 26th. Doubtless he sold his wife's furniture because he had deserted her chamber some time before he left for Danville» and had resolved they never could live together as man and wife, as he had declared to her brother, a few days before he left for Danville.